## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATALIA USECHE
125 NE 32nd Street #2114
Miami, FL 33147;

JOYCE BROWN
318 B-2 Knotty Pine Circle
Greenacres, FL 33462;

AMIT DODANI
23964 Strathern Street
West Hills, CA 91304;

NATALIE HERNANDEZ
506 Wheaties Way
Las Vegas, NV 89110;

MICHAEL KAGAN
1909 Plaza de Cordero
Las Vegas, NV 89102;

ANGELA KANG
2645 Gate Ridge Drive
Austin, TX 78748;

ANGEL LIRA
207 Alicante Aisle
Irvine, CA 92614;

CHARLES PARK
4-15 35th Avenue #3A
Jackson Heights, NY 11374;

ANGEL ULLOA
7245 Espolon Drive
El Paso, TX 79912;

and

KATHI WHITE
5639 Westover Street
Houston, TX 77033,

Plaintiffs,

Case No. _____

**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF**

v.

DONALD J. TRUMP, in his official capacity as
    President of the United States of America
1600 Pennsylvania Avenue NW
Washington, DC 20006;

UNITED STATES DEPARTMENT OF
    COMMERCE
1401 Constitution Avenue NW
Washington, DC 20230;

UNITED STATES CENSUS BUREAU
4600 Silver Hill Road
Suitland, Prince George's County, MD 20746;

WILBUR L. ROSS, JR., in his official capacity
    as Secretary of Commerce
1401 Constitution Avenue NW
Washington, DC 20230;

and

STEVEN DILLINGHAM, in his official
    capacity as Director of the United States
    Census Bureau
4600 Silver Hill Road
Suitland, Prince George's County, MD 20746,

Defendants.

## INTRODUCTION

1.      Plaintiffs—ten United States citizens and registered voters residing in California, Florida, Nevada, New York, and Texas—bring this action to stop President Donald J. Trump and his Administration from violating the Constitution's absolute command to apportion congressional seats based upon an enumeration of all persons—regardless of their citizenship or immigration status—counted through the decennial census.

2.      On July 21, 2020, President Trump issued a "Memorandum on Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census" (the "Presidential Memorandum") purporting to announce a new "policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status," and directing the Secretary of Commerce to execute this policy by providing the President with an estimate of the number of "illegal aliens" residing in each state.

3.      The President's directive is intended to—and will—deprive diverse states and communities of political power in Congress and the Electoral College and deny the residents of those states, including Plaintiffs, their rights to equal political representation. This violation of the Constitution's equal protection guarantee is the latest act in an ongoing campaign by Defendants to manipulate the Census and apportionment processes to redistribute political power in the United States from the growing numbers of racial and ethnic minorities to non-Hispanic whites.

4.      Contrary to the Presidential Memorandum's extraordinary assertion of executive authority, neither the Constitution nor the governing statutes give the President the unfettered discretion to determine the number of congressional seats and electoral votes awarded to each state. The President is not free to substitute his own manufactured population figures for the "actual enumeration" of the population that the Constitution requires.

1

5.      Plaintiffs seek declaratory and injunctive relief to block Defendants from carrying out President Trump's lawless arrogation of power and scuttling over two centuries of constitutional law and practice.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiffs' claims arising under the Constitution and federal statutes and under 28 U.S.C. § 1361. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, mandamus relief, and other relief against Defendants pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

7.      Venue is proper under 28 U.S.C. § 1391(e)(1). Defendants United States Census Bureau and Steven Dillingham reside in Prince George's County within this District. In addition, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

8.      Plaintiff Natalia Useche is a United States citizen eligible and registered to vote and residing in Miami, Florida.

9.      Plaintiff Joyce Brown is a United States citizen eligible and registered to vote and residing in Greenacres, Florida.

10.      Plaintiff Amit Dodani is a United States citizen eligible and registered to vote and residing in West Hills, California.

11.      Plaintiff Natalie Hernandez is a United States citizen eligible and registered to vote and residing in Las Vegas, Nevada.

12.      Plaintiff Michael Kagan is a United States citizen eligible and registered to vote and residing in Las Vegas, Nevada.

13.     Plaintiff Angela Kang is a United States citizen eligible and registered to vote and residing in Austin, Texas.

14.     Plaintiff Angel Lira is a United States citizen eligible and registered to vote and residing in Irvine, California.

15.     Plaintiff Charles Park is a United States citizen eligible and registered to vote and residing in Jackson Heights, New York.

16.     Plaintiff Angel Ulloa is a United States citizen eligible and registered to vote and residing in El Paso, Texas.

17.     Plaintiff Kathi White is a United States citizen eligible and registered to vote and residing in Houston, Texas.

18.     Defendant Donald J. Trump is the President of the United States. President Trump is sued in his official capacity.

19.     Defendant United States Department of Commerce is a cabinet-level department of the United States federal government. It oversees the development, content, and implementation of the federal decennial census, including the 2020 Census, by the United States Census Bureau.

20.     Defendant United States Census Bureau ("Census Bureau" or "Bureau") is an agency within the Department of Commerce. It is responsible for developing and implementing the 2020 Census, subject to oversight by the Department of Commerce.

21.     Defendant Wilbur L. Ross, Jr., is the Secretary of Commerce. He has responsibility for overseeing the Census Bureau, including with respect to the Bureau's responsibility to develop and implement the 2020 Census. Secretary Ross is sued in his official capacity.

22.     Defendant Steven Dillingham is the Director of the United States Census Bureau. He has responsibility for implementing the 2020 Census. Director Dillingham is sued in his official capacity.

**FACTUAL ALLEGATIONS**

I.     **THE LEGAL FRAMEWORK GOVERNING CONGRESSIONAL APPORTIONMENT AND THE DECENNIAL CENSUS**

   A.     **The Constitution Requires Congressional Apportionment to be Based on the "Whole Number of Persons" Counted by an "Actual Enumeration."**

23.     Pursuant to the Fourteenth Amendment, Article I, Section 2 of the Constitution provides: "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2 (the "Apportionment Clause").

24.     The adoption of the Fourteenth Amendments following the Civil War enshrined the principle of equal representation of all *persons* residing in the United States, excluding *only* "Indians not taxed," in determining congressional apportionment. The use of the word "person" in the Fourteenth Amendment has always been interpreted to include non-citizens—regardless of immigration status. *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments."); *see Truax v. Raich*, 239 U.S. 33, 41 (1915) ("If this could be refused solely upon the ground of race or nationality, the prohibition of the denial to any person of the equal protection of the laws would be a barren form of words."); *Li Sing v. United States*, 180 U.S. 486, 495 (1901); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) ("The Fourteenth Amendment to the Constitution is not confined to the protection of citizens.").

4

25.     While drafting the Fourteenth Amendment, Congress considered and rejected options to limit the population used for congressional apportionment to "voters" or "citizens." *See* Cong. Globe, 39th Cong., 1st Sess. 141 (1866) (remarks of Rep. Blaine) ("These propositions have differed somewhat in phrase, but they all embrace substantially the one idea of making suffrage instead of population the basis of apportioning Representatives."). Instead, the Fourteenth Amendment credits the important role non-citizens play in society and the importance of providing representation to those who cannot vote. "As an abstract proposition no one will deny that population is the true basis of representation; for women, children and other non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot." *Id.* The ratification of the Fourteenth Amendment embodied a deliberate choice to include *everyone* residing within the United States in determining congressional apportionment.

26.     Even at the Founding, the "whole number of persons in each State" for apportionment purposes was understood to mean all persons present in the country (other than Indians not taxed) without regard to voting eligibility, citizenship, or immigration status. Representatives were to be "apportioned among the several States which may be included within this Union, according to their respective Numbers, which shall be determined by adding to the whole Number of free Persons, including those bound to Service for a Term of Years, and excluding Indians not taxed, three fifths of all other Persons." U.S. Const. art. I, § 2, cl. 3 (amended 1868). Although the stain of the "three fifths" clause applicable to enslaved people was not removed until after the Civil War, the Constitution has always embraced the principle that *all* persons living in the United States must be counted.

27.     The Constitution's original use of the word "persons" in this clause was intentional. "Endorsing apportionment based on total population, Alexander Hamilton declared: 'There can be no truer principle than this—that every individual of the community at large has an equal right to the protection of government.'" *Evenwel v. Abbott*, 136 S. Ct. 1120, 1127 (2016) (quoting The Federalist No. 54, p. 284 (G. Carey & J. McClellan eds. 2001)); *see id.* ("'It is a fundamental principle of the proposed constitution,' James Madison explained in the Federalist Papers, 'that . . . the aggregate number of representatives allotted to the several states, is to be . . . founded on the aggregate number of inhabitants.'") (quoting 1 Records of the Federal Convention of 1787, p. 473 (M. Farrand ed. 1911)).

28.     The Supreme Court has summarized the Founders' intent regarding this provision as follows: "The debates at the [Constitutional] Convention make at least one fact abundantly clear:  that when the delegates agreed that the House should represent 'people' they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's *inhabitants*." *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964) (emphasis added). "The Constitution embodied Edmund Randolph's proposal for a periodic census to ensure 'fair representation of the people,' an idea endorsed by [George] Mason as assuring that 'numbers of inhabitants' should always be the measure of representation in the House of Representatives." *Id.* at 13-14.

29.     In 1929, during a debate over a constitutional amendment, the Senate's Legislative Counsel advised Congress that "the evidence of the records of the Constitutional Convention, and the uniform past congressional construction of the term by Congress in its apportionment legislation, all lead to the conclusion that the term 'persons' as used in section 2 of the fourteenth amendment includes aliens as well as citizens." 71 Cong. Rec. 1822 (1929).

Counsel therefore gave its opinion that "there is no constitutional authority for the enactment of legislation excluding aliens from enumeration for the purposes of apportionment of Representatives among the States." *Id.*

30.    Total population count as the basis for apportionment honors the fact that representatives serve all their constituents, those who vote for them and those who do not, as well as those who are unqualified to vote for any number of reasons. *Evenwel*, 136 S. Ct. at 1132 ("As the Framers of the Constitution and the Fourteenth Amendment comprehended, representatives serve all residents, not just those eligible or registered to vote.").

31.    The Constitution further requires that "the whole number of persons" be determined through an "actual Enumeration." U.S. Const. art. I, § 2, cl. 3 (the "Enumeration Clause").

32.    At the Founding, the term "enumeration" was understood to "require[] an actual counting, and not just an estimation of number." *Utah v. Evans*, 536 U.S. 452, 492-93 (2002) (Thomas, J., concurring in part and dissenting in part) (quoting *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 346–47 (1999) (Scalia, J., concurring in part)). This concept of an "actual Enumeration" is "incompatible . . . with gross statistical estimates." *Id.*

33.    The Enumeration Clause thus requires the Secretary of Commerce and Census Bureau to undertake an actual counting to obtain the data used for apportionment purposes. Statistical estimates and aggregate data cannot substitute for "efforts to reach households and enumerate each individual." *Utah v. Evans*, 536 U.S. at 476–77 (majority opinion).

**B.**     **Federal Statutes and Regulations Reinforce the Constitutional Requirement That Non-Citizens Must Be Counted in the Decennial Census and Included in the Apportionment Base.**

34.     The Constitution commands that an "actual Enumeration" of the population shall be conducted every ten years "in such Manner as [Congress] shall by Law direct." U.S. Const. art. I, § 2, cl. 3. Congress has exercised this constitutional authority by enacting Title 13 of the United States Code, which governs the Census and is commonly referred to as the Census Act. *See Dep't of Commerce v. U.S. House*, 525 U.S. at 320. For the 2020 Census, the Census Act requires the Secretary of Commerce to "take a decennial census of population as of" April 1, 2020. 13 U.S.C. § 141(a).

35.     Although Congress has delegated to the Secretary of Commerce primary responsibility for conducting the decennial census, the Secretary is bound to "perform the functions and duties imposed upon him by [Title 13]," 13 U.S.C. § 4, and has no discretion or authority in conducting the decennial census beyond that conferred by the Census Act itself. *See, e.g.*, *Dep't of Commerce v. U.S. House*, 525 U.S. at 334-44.

36.     The Secretary is required to report to the President by January 1, 2021, "[t]he tabulation of total population by States" under the decennial census "as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b). By its plain terms, the Act requires the Secretary to report to the President the "total population" of the States and not some other measure.

37.     Under 2 U.S.C. § 2a(a), the President is required to "transmit to the Congress "a statement showing" two specific items: (i) "the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population," and (ii) "the number of Representatives to which each State would be entitled under

8

an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member." 2 U.S.C. § 2a(a).

38.     This statutory requirement that the President provide Congress with a statement of the "whole number of persons in each State, excluding Indians not taxed" mirrors the wording of the Constitution's Apportionment Clause, as amended by the Fourteenth Amendment, which commands that congressional apportionment be conducted based on the States' "respective numbers, counting *the whole number of persons in each State, excluding Indians not taxed*." U.S. Const. art. I, § 2, cl. 3; U.S. Const. amend. XIV, § 2 (emphasis added). Moreover, the statute makes plain that the required statement of the "whole number of persons in each State" must report the figures "*as ascertained under the . . . decennial census*"—not by some other ad hoc data collection or survey.  2 U.S.C. § 2a(a) (emphasis added).

39.     The U.S. Supreme Court has held that the President holds no discretion in performing the "admittedly ministerial" calculation of "[t]he number of Representatives to which each State would be entitled" based upon the "whole number of persons in each State" pursuant to 2 U.S.C. § 2a(a). *Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992). The President's discretion over the reporting of "the whole number of persons in each State" as ascertained under the decennial census is likewise limited: the President must transmit the results of the "actual Enumeration" of *all* "persons" counted in the decennial census as the Constitution and the Census Act require.

40.     The Census Act confirms and specifies what the Constitution and two centuries of practice command: for purposes of apportionment, the decennial census figures must reflect a person-by-person count of *every* inhabitant of every State where each such person resides. While 13 U.S.C. § 141(a) authorizes the Secretary of Commerce to use "sampling

9

procedures and special surveys" for some purposes, statistical sampling "for the determination of population for purposes of apportionment of Representatives in Congress among the several States" is strictly prohibited. 13 U.S.C. §§ 141(a), 195.

41.     Indeed, Congress has distinguished the "actual Enumeration" required by the Constitution from other data yielded by statistical sampling and statistical adjustments, finding that "the use of statistical sampling or statistical adjustment in conjunction with an actual enumeration to carry out the census with respect to any segment of the population poses the risk of an inaccurate, invalid, and unconstitutional census." Pub. L. No. 105-119, tit. II, § 209(a)(7), 111 Stat. 2480 (1997) (codified at 13 U.S.C. § 141 note).

42.     Contrary to the unsupported assertion in the Presidential Memorandum, the determination of which "persons should be considered 'inhabitants' for the purpose of apportionment" does not require an "exercise of judgment." Presidential Memorandum § 1. By its plain meaning, an inhabitant is *any* person who lives in or regularly occupies a place.

43.     This plain meaning is further underscored by the Census Bureau's "Residence Rule," which specifies the Bureau's criteria for "count[ing] *everyone* in the right place during the decennial census." Census Residence Criteria and Residence Situations ("Residence Rule"), 83 Fed. Reg. 5525, 5526 (Feb. 8, 2018).

44.     The Residence Rule, which was promulgated by the Department of Commerce pursuant to formal notice-and-comment rulemaking procedures, provides that undocumented immigrants and other "citizens of foreign countries living in the United States" must be "[c]ounted at the U.S. residence where they live and sleep most of the time." *Id.* at 5533. As the Residence Rule expressly affirmed, the practice of counting all persons at their place of

residence is centuries-old and goes back to the law authorizing the first Census, the Act of March 1, 1790, which called for persons to be enumerated at their "usual place of abode." *Id.* at 5526.

45.     During the notice-and-comment procedure for the Residence Rule, the Census Bureau considered and rejected a comment that "expressed concern about the impact of including undocumented people in the population counts for redistricting because these people cannot vote." *Id.* at 5530. To the contrary, the Census Bureau reaffirmed its longstanding guidance that "[f]oreign citizens are considered to be 'living' in the United States if, at the time of the census, they are living and sleeping most of the time at a residence in the United States." *Id.*

46.     The population figures "ascertained under . . . the decennial census" therefore necessarily *include* all persons "living and sleeping most of the time at a residence in the United States"—that is, all inhabitants of every State, regardless of their citizenship or immigration status. Neither the Constitution nor federal statutory law (or the regulations promulgated thereunder) afford Defendants any discretion or latitude to exclude from the apportionment base any person enumerated as part of the decennial census. The contrary assertions in the Presidential Memorandum are *ultra vires* and in contravention of well-established law.

**C.      The "Information" Demanded by the Presidential Memorandum Must Satisfy the Census Bureau's Procedural and Statistical Requirements.**

47.     The Presidential Memorandum directs the Secretary of Commerce to provide the President with certain "information" that would "permit[]" him to carry out his announced intention to exclude "illegal aliens" from the congressional apportionment base. Presidential Memorandum § 3. But no "information" can even arguably be used by the President

for such purpose unless it is collected for the decennial census by the Census Bureau, consistent with the Census Act and the rigorous regulatory framework governing the Bureau's work.

48.     The Census Bureau is a "statistical agency" within the "Federal statistical system," which is designed to guarantee that the Census Bureau provides impartial, unbiased, and objective data consistent with the highest standards of statistical accuracy and reliability. All data collection efforts by the Bureau are subject to the standards and directives of the Office of Management and Budget ("OMB") under the Paperwork Reduction Act, 44 U.S.C. §§ 3501–3521, and the Information Quality Act , *see* Consolidated Appropriations Act of 2001, Pub. L. No. 106-554, 114 Stat. 2763 (2000) (amending the Paperwork Reduction Act).

49.     The Paperwork Reduction Act requires OMB to "coordinate the activities of the Federal statistical system to ensure . . . the integrity, objectivity, impartiality, utility, and confidentiality of information collected for statistical purposes." 44 U.S.C. § 3504(e)(1). The Act also confers the OMB Director with discretion to "review and approve proposed agency collections of information." *Id.* § 3504(c)(1).

50.     The Information Quality Act reinforces the aims of the Paperwork Reduction Act by instructing OMB and federal agencies to issue guidance for "ensuring and maximizing the quality, objectivity, utility, and integrity of information they disseminate." Consolidated Appropriations Act of 2001, Pub. L. No. 106-554, § 515(a), 114 Stat. 2763 (2000) (amending the Paperwork Reduction Act).

51.     For example, under OMB Statistical Policy Directive No. 1, federal statistical agencies such as the Census Bureau must "apply sound statistical methods to ensure statistical products are accurate" and "produce data that are impartial, clear, and complete and are readily perceived as such by the public." Office of Mgmt. and Budget, *Statistical Policy*

12

*Directive No. 1, Fundamental Responsibilities of Fed. Statistical Agencies and Recognized Statistical Units*, 79 Fed. Reg. 71610, 71615 (Dec. 2, 2014). The directive further advises that the Census Bureau "must function in an environment that is clearly separate and autonomous from the other administrative, regulatory, law enforcement, or policy-making activities within their respective Departments" and "must be able to conduct statistical activities autonomously when determining what information to collect and process." *Id.*

52.     Pursuant to its obligations under the Information Quality Act, the Census Bureau has also issued stringent Information Quality Guidelines that require it to "provide information that is accurate, reliable and unbiased." U.S. Census Bureau, Information Quality: Objectivity, https://www.census.gov/about/policies/quality/guidelines/objectivity.html (last visited July 29, 2020). The Bureau accomplishes this "by using reliable data sources and sound analytical techniques." *Id.*

53.     Under the Census Act and the federal statistical agency framework, it is the Census Bureau that conducts the decennial census subject to these exacting statistical standards and controls. Neither the President nor the Secretary of Commerce can collect data involving the Census on an ad hoc basis, in the dark and off on their own. Any "information" that is used to modify or subtract from the "actual Enumeration" of the "whole number of persons in each State ascertained under . . . the decennial census," without first satisfying all of the procedural and statistical quality standards applicable to the Census Bureau's data collection activities, constitutes a per se violation of federal law. Any action taken by the Secretary intended to supply such tainted "information" outside this established regulatory framework is contrary to law and should be enjoined.

13

## II.   THE TRUMP ADMINISTRATION'S EFFORTS TO USE THE 2020 CENSUS TO SHIFT POLITICAL POWER TO NON-HISPANIC WHITES

54.   Defendants' attempt to exclude undocumented non-citizens from the apportionment base is just the latest effort in their ongoing discriminatory scheme to dilute the voting power of non-whites, Hispanics,[1] and immigrants of color, and to shift political power to non-Hispanic whites.

### A.   Defendants' Efforts to Gather Citizenship Data to Shift Voting Power from Non-Whites, Hispanics, and Immigrants of Color to Non-Hispanic Whites.

55.   At the outset of the Trump presidency, members of the Administration worked with Dr. Thomas Hofeller, a well-known Republican redistricting strategist, to pursue citizenship data that could be used to shift the distribution of political representation away from racial and ethnic minorities.

56.   Hofeller had studied the potential impact of excluding non-citizens from the population for purposes of allocating political representation and determined that such exclusion would dilute the political power of diverse communities and would thus "be advantageous to Republicans and Non-Hispanic Whites." Pls.' Mot. for Order to Show Cause Ex. D at 9, *New York v. Dep't of Commerce*, No. 18-CV-2921 (S.D.N.Y. May 31, 2019), ECF No. 595-1.

57.   Hofeller concluded that effectuating this scheme would require the addition of a citizenship question to the 2020 Census, as such a question would generate the data necessary to exclude non-citizens from the population base. Hofeller then discussed this strategy with Mark Neuman, the Trump transition official responsible for issues related to the Census.

---

[1] The federal government recognizes "Hispanic or Latino" as a single ethnicity. For purposes of this Complaint, Plaintiffs refer to this group as "Hispanic."

Neuman went on to serve as a "trusted advisor" to Secretary Ross on Census issues. Mem. Op. at 7, *Kravitz v. U.S. Dep't of Commerce*, No. 8:18-cv-01041-GJH (D. Md. June 24, 2019), ECF No. 175.

58.     Meanwhile, Kris Kobach, who advised the President on immigration issues during the 2016 presidential campaign and also served on the Trump transition team, urged the President to add a citizenship question to the 2020 Census questionnaire because California in particular has had its "congressional seats inflated by counting illegal aliens." Bryan Lowry, *That Citizenship Question on the 2020 Census? Kobach Says He Pitched It to Trump*, Kan. City Star (Mar. 27, 2018, 2:01 p.m.), https://www.kansascity.com/news/politics-government/article207007581.html. Kobach stated to the media that President Trump was "absolutely . . . interested in this."

59.     At the behest of the Chief White House Strategist Steve Bannon, Kobach also communicated with Secretary Ross during the early days of the Trump Presidency about excluding undocumented immigrants from the congressional apportionment. Kobach and Secretary Ross discussed the effect that asking about citizenship status as part of the decennial census would have on "congressional apportionment." Findings of Fact and Conclusions of Law at 9, *Kravitz v. U.S. Dep't of Commerce*, No. 8:18-cv-01041-GJH (D. Md. Apr. 5, 2019), ECF No. 154.

60.     Secretary Ross also discussed with his own senior staff the possibility of excluding undocumented immigrants from the population for purposes of congressional apportionment. For example, on March 10, 2017, Deputy Chief of Staff and Director of Policy Earl Comstock emailed the Secretary an article entitled "The Pitfalls of Counting Illegal

Immigrants" in response to the Secretary's inquiry into whether undocumented people were counted for apportionment purposes. *Id.* at 8-9.

61.     Secretary Ross, Neuman, and other government officials then worked with Hofeller to effectuate the scheme of obtaining citizenship data in order to dilute the votes of minorities for the benefit of non-Hispanic whites. With Secretary Ross's blessing, Hofeller helped to ghostwrite a letter from the Department of Justice ("DOJ") purporting to request the inclusion of a citizenship question on the 2020 Census questionnaire. Mem. Op. at 7-8, *Kravitz v. U.S. Dep't of Commerce*, No. 8:18-cv-01041-GJH (D. Md. June 24, 2019), ECF No. 175.

62.     Neuman delivered that draft letter to John Gore, Acting Assistant Attorney General for the Civil Rights Division. *Id.* at 8. Gore would later formally request the Census Bureau to include the citizenship question in the 2020 Census. Gore claimed the data would assist DOJ in complying with its obligations under the Voting Rights Act ("VRA"). But this explanation was pure pretext. Far from seeking to *protect* voting rights, the Administration was putting a plan in motion to curtail the voting rights of millions of Americans.

63.     In March 2018, Secretary Ross announced the government's intention to include a citizenship question on the 2020 Census. *See* Wilbur Ross, *Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire* (Mar. 26, 2018), https://www.commerce.gov/sites/default/files/2018-03-26_2.pdf. In defending that decision, the Secretary parroted the pretextual rationale concocted by Hofeller's allies at DOJ that obtaining citizenship data would help DOJ to enforce the VRA. Plaintiffs from around the country challenged the Department's decision to include the citizenship question in the 2020 Census, and several courts—including this Court—agreed that the Department's announced action violated

the Administrative Procedure Act ("APA") and enjoined the Department from proceeding. *See Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 756 (D. Md. 2019).

64.     Ultimately, when a parallel lawsuit reached the U.S. Supreme Court, the Court agreed that Secretary Ross's plan to include a citizenship question on the 2020 Census was unlawful under the APA. The Court found the Department's explanation that citizenship data would aid with implementing the VRA to be "contrived" and "incongruent with what the record reveal[ed] about the agency's priorities and decisionmaking process." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019)*. It therefore affirmed the lower court's decision enjoining Secretary Ross from including the citizenship question on the 2020 Census.

65.     Details of Hofeller's hidden campaign to dilute the votes of diverse communities did not come to light until after multiple district courts had enjoined the Department of Commerce from proceeding with a citizenship question in the 2020 Census. Upon discovery of documents from Hofeller's files that evidenced this scheme, and while the parallel case before the Supreme Court was pending, the *Kravitz* court issued an order indicating that it would reconsider its prior ruling rejecting plaintiffs' equal protection challenge to the inclusion of a citizenship question because the "new evidence potentially connects the dots between a discriminatory purpose—diluting Hispanics' political power—and Secretary Ross's decision." Mem. Op. at 8, *Kravitz v. U.S. Dep't of Commerce*, No. 8:18-cv-01041-GJH (D. Md. June 24, 2019), ECF No. 175.

66.     Undeterred by their setback before the Supreme Court, President Trump and Secretary Ross moved forward with their plan. On July 11, 2019—just two weeks after the Supreme Court invalidated the inclusion of the citizenship question in the 2020 Census—the President issued an executive order directing federal agencies, including the Department of

Homeland Security, the Department of State, the Social Security Administration, and the Department of Health and Human Services, to "promptly provide the Department [of Commerce]" information that would help the Department "in determining the number of citizens, non-citizens, and illegal aliens in the country." Executive Order 13880, Collecting Information About Citizenship Status in Connection With the Decennial Census § 3, 84 Fed. Reg. 33821, 33821 (July 11, 2019) (the "2019 Executive Order").

67.     When announcing the 2019 Executive Order from the Rose Garden, the President declared, "I'm here to say we are not backing down on our effort to determine the citizenship status of the United States population."

68.     The 2019 Executive Order made clear that the data would be used to suppress the voting rights of diverse communities by allowing "States to design State and local legislative districts based on the population of voter-eligible citizens." *Id.* § 1. According to President Trump, "States could more effectively exercise this option"—*i.e.*, dilute the votes of districts with larger populations of non-citizens and undocumented non-citizens—"with a more accurate and complete count of the citizen population." Indeed, the 2019 Executive Order admits that the President had been in contact with "some State officials" who were "interested in such data for districting purposes." *Id.*

69.     Contemporaneous statements by the President reflect that the 2019 Executive Order was motivated by a desire to harm the political interests of immigrant communities. On July 1, President Trump claimed in public remarks that "Democrats want to treat the illegals, with healthcare and other things, better than they treat the citizens of this country." *Remarks by President Trump at Signing of H.R. 3401*, White House (July 1, 2019) https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-h-r-3401/.

Several days later he admitted the true reason for seeking citizenship data: "Number one, you need it for Congress. You need it for Congress, for districting." *Remarks by President Trump Before Marine One Departure*, White House (July 5, 2019), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-51/.

70.     These public statements are consistent with comments President Trump has made since the dawn of his 2016 campaign demonizing immigrant communities and Hispanics. He has claimed that Mexican immigrants are "not Mexico's 'best,' but are 'people that have lots of problems,' 'the bad ones,' 'criminals, drug dealers, [and] rapists.'" *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 276 (E.D.N.Y. 2018). And "in August 2017, [President Trump] referred to undocumented immigrants as 'animals' who are responsible for 'the drugs, the gangs, the cartels, the crisis of smuggling and trafficking, MS 13.'" *Regents of the Univ. of Cal.  v. U.S. Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304, 1314 (N.D. Cal. 2018). As these statements demonstrate, the 2019 Executive Order was not simply aimed at developing more accurate citizenship data; it was a critical step in Defendants' plot to exclude the groups they demonized from the body politic.

**B.     The July 21, 2020 Presidential Memorandum.**

71.     On July 21, 2020, President Trump issued the Presidential Memorandum titled "Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census."

72.     The Presidential Memorandum acknowledges that the government is required by law to conduct a decennial census in which it enumerates the "whole number of persons in each State." Presidential Memorandum § 1. It further claims that the President has discretion to determine "which persons should be considered 'inhabitants'" of each State. *Id.* The

Presidential Memorandum then concludes that this discretion grants the President authority to "exclude from the apportionment base aliens who are not in a lawful immigration status." *Id.*

73.     Neither the President nor anyone in the federal government has provided a legal basis for this startling claim of executive authority. According to the Presidential Memorandum, excluding undocumented non-citizens from the count would be "more consonant with the principles of representative democracy." *Id.* § 2. And it would avoid "reward[ing]" unnamed states that President Trump claims have "adopt[ed] policies that encourage illegal aliens to enter this country." *Id.*

74.     Relying on this bald assertion, the Presidential Memorandum announces that "it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act . . . to the maximum extent feasible and consistent with the discretion delegated to the executive branch." *Id.* § 2.

75.     The Presidential Memorandum then directs the Secretary of Commerce to provide information to the President that will allow him to exclude undocumented non-citizens from the apportionment. *Id.* § 3. In doing so, the Presidential Memorandum notes that the 2019 Executive Order had directed the Department of Commerce to compile data on the number of "illegal aliens" in the country "for the purpose of conducting the apportionment." *Id.* § 1.

76.     Upon information and belief, the Department of Commerce has issued directives to the Census Bureau to implement the policy announced in the Presidential Memorandum and exclude undocumented non-citizens from the enumeration used for congressional apportionment. Defendants' implementation of the Presidential Memorandum

20

constitutes final agency action that is judicially reviewable under the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 704, 706.

## III.   PLAINTIFFS' INJURIES RESULTING FROM DEFENDANTS' UNLAWFUL CONDUCT

77.     Defendants' exclusion of undocumented non-citizens from the apportionment base, as announced and directed by the Presidential Memorandum, will harm Plaintiffs by: (i) causing their states to be unlawfully deprived of representation in the U.S. House of Representatives and electoral votes in the Electoral College, thereby diluting Plaintiffs' votes; and (ii) causing a disproportionate undercount in the states and localities in which Plaintiffs reside that will in turn result in the dilution of Plaintiffs' votes, a loss of political representation, and under-allocation of federal funding to Plaintiffs' communities.

### A.     The Presidential Directive Will Reduce Plaintiffs' Political Representation and Dilute Their Voting Power by Excluding Undocumented Immigrants from the Apportionment Base.

78.     The exclusion of undocumented non-citizens from the apportionment base for purposes of allocating seats in the U.S. House of Representatives, as announced and directed by the Presidential Memorandum, will undoubtedly alter how those seats are allocated among the states. Those states with larger undocumented immigrant populations will lose seats. These lost seats would be transferred to states that are comparatively less diverse, bolstering the political power of non-Hispanic whites.

79.     The Pew Research Center has estimated that "if unauthorized immigrants were excluded from the apportionment count, California, Florida and Texas would each end up with one less congressional seat than they would have been awarded based on population change alone." *See* Jeffrey S. Passel & D'Vera Cohn, *How Removing Unauthorized Immigrants from Census Statistics Could Affect House Reapportionment*, Pew Research Center (July 24, 2020),

https://www.pewresearch.org/fact-tank/2020/07/24/how-removing-unauthorized-immigrants-from-census-statistics-could-affect-house-reapportionment/. All of those states have a lower percentage of non-Hispanic whites and higher percentages of non-whites, Hispanics, and immigrants than the national averages. Pew further estimates that Alabama, Minnesota, and Ohio—which all have a higher percentage of non-Hispanic whites and lower percentages of non-whites, Hispanics, and immigrants than the national averages—would each gain a congressional seat.

80.     Plaintiffs residing in states that lose a congressional seat due to the Presidential Memorandum's unlawful directive will suffer the direct dilution of their vote. The loss of congressional representation will also weaken their ability to engage with the federal government through their representatives and decrease their influence over policy on the federal level.

81.     The damage would not, however, be limited to congressional representation. Defendants' unlawful scheme would also weaken Plaintiffs' influence over future presidential elections. Under the Constitution, each state is entitled to a number of electors in the Electoral College equal to each state's membership in the Senate and the House of Representatives. U.S. Const. art. II, § 1, cl. 2. Thus, each state that loses a seat in the House likewise loses an elector in the Electoral College. The political influence and voting power of each Plaintiff residing in those states would be diluted as a result.

82.     The Electoral College already undermines the political power of racial and ethnic minorities in presidential elections. At the Founding, the Electoral College gave outsized influence to the white citizens of Southern, slave-owning states who were entitled to additional seats in the House (and hence, additional electors in the Electoral College) because three fifths of

their enslaved populations were counted for purposes of apportionment. Even after the

Fourteenth Amendment eliminated the three-fifths clause, the Electoral College has continued to

curtail the influence of minority voters. Because most states require their electors to cast their

votes in favor of the candidate who wins the popular vote in that state, the votes of minority

groups are often insufficient to affect the outcome of a presidential election. *See* Wilfred

Codrington III, *The Electoral College's Racist Origins*, The Atlantic (Nov. 17, 2019),

https://www.theatlantic.com/ideas/archive/2019/11/electoral-college-racist-origins/601918/. By

excluding undocumented non-citizens from the apportionment base and effectively transferring

power in the Electoral College from more diverse states to less diverse states, the Presidential

Memorandum's directive worsens the anti-minority bias baked into the Electoral College.

       83.    The unlawful policy announced and directed in the Presidential

Memorandum also risks diluting Plaintiffs' political power in state and local elections. As

President Trump made clear in his 2019 Executive Order, one purpose of the unlawful scheme is

to provide citizenship data to the states so they can draw legislative districts in a manner that

weakens the voting strength of communities with large populations of undocumented non-

citizens. 2019 Executive Order § 1. If states exclude undocumented non-citizens for purposes of

redistricting, they could redraw district lines to pack immigrant populations together in fewer

districts, thus diluting the relative voting strength of individuals in those districts.

       84.    This is not just a hypothetical side-effect of Defendants' actions.

According to the 2019 Executive Order, "some State officials" have already requested

citizenship data from the federal government so that they can use that data in their next round of

redistricting. *Id.* Indeed, Hofeller urged the Administration to include a citizenship question in

the 2020 Census precisely so that data could be used by state legislatures to advantage

Republicans and non-Hispanic whites. In light of this history, there is a substantial risk that Defendants' allies in state government will follow Defendants' lead and take advantage of this opportunity to artificially inflate the political power of non-Hispanic white communities for years to come.

> **B.      The Presidential Directive Will Exacerbate the Undercount in Plaintiffs' States and Localities, Resulting in Further Harms to Plaintiffs.**

85.     Defendants' announcement and implementation of a policy to exclude undocumented non-citizens from the population count used for purposes of congressional apportionment will further injure Plaintiffs by causing a disproportionate undercount in their states and localities.  This undercount will result in the further dilution of Plaintiffs' votes and loss of political representation, as well as under-allocations of federal funding to Plaintiffs' communities.

86.     Research and testing on census participation, including work conducted by the Census Bureau, have shown that certain demographic groups, including immigrants, non-citizens, and individuals of Hispanic origin are traditionally "hard to count" for purposes of the decennial census. This is in part because they are more likely to be suspicious about the purpose of the decennial census and the government's use of census data. Census field-testing reveals that these groups have become even more suspicious and distrustful of government efforts to collect personal data since President Trump took office in 2017.

87.     Trust between the public and the Census Bureau is crucial. Prior studies conclude that response rates will fall without a high degree of trust, leading to a survey project that is biased because it excludes people from the data and is no longer representative. The social and political context during survey implementation can greatly impact trust, confidence, and participation rates. This is especially the case for vulnerable populations when they perceive an

24

unwelcoming environment or context. A study by Manuel de la Puente conducted in 2004 concluded that individuals with unstable immigration statuses were much less likely to trust the government and less likely to fill out the decennial census questionnaire.

88.     A research study by the U.S. Government Accountability Office in 2003 (GAO-03-605) laid out the most appropriate approaches to surveying the Hispanic population specifically. The report was commissioned because prior government surveys, particularly the decennial census, observed high rates of non-response with Hispanic respondents. The report stated that distrust—especially of those representing the government—was a leading factor in Hispanic immigrant non-response. To fix this, the report recommends increasing trust so that potential survey respondents are not fearful of their participation, and not suspicious of the questions being asked or of the decennial census enumerators visiting their community.

89.     A comprehensive study by the Census Bureau's Center for Survey Measurement presented at the National Advisory Committee on Racial, Ethnic, and Other Populations Fall Meeting 2017 reported an increase in respondents expressing concerns to researchers and field staff about confidentiality and data access related to immigration, legal residency, and citizenship status, and their perception that certain immigrant groups are unwelcome.

90.     The Presidential Memorandum's directive to identify and exclude undocumented non-citizens will increase the likelihood that traditionally hard-to-count groups— including immigrants, non-citizens, and individuals of Hispanic origin—will not respond to the 2020 Census, which will in turn lead to a disproportionate undercount in states and localities that have relatively larger shares of these populations.

91.     California, Texas, Florida, Nevada, and New York, and almost all of the localities within those states in which Plaintiffs reside, have higher percentages of immigrants, non-citizens, and individuals of Hispanic origin than national and state averages. Thus, a disproportionate undercount of these groups will result in a disproportionate undercount in Plaintiffs' states and localities relative to the nation and the other areas of their states.

92.     The states in which Plaintiffs reside each use decennial census data to draw congressional and state legislative districts of equal population, as required by the Constitution. A disproportionate undercount of the population in Plaintiffs' localities caused by Defendants' public efforts to exclude undocumented non-citizens from the apportionment base will therefore result in Plaintiffs being drawn into overpopulated voting districts, diluting their votes and denying them their constitutional right to equal political representation.

93.     A large number of federal domestic financial assistance programs— including the Surface Transportation Block Grant (STBG) Program, Medicaid, Title I of the Elementary and Secondary Education Act of 1965 (Title I), State Children's Health Insurance Program (CHIP), and others—rely on decennial census population counts to allocate money to states and localities. Federal programs that allocate funds based on census-derived data are highly sensitive to inaccuracies in such data. A disproportionate undercount of the population in Plaintiffs' states and localities caused by Defendants' public efforts to exclude undocumented non-citizens from the apportionment base will therefore harm Plaintiffs by causing their communities to receive less federal funding than they would otherwise receive.

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of the Apportionment Clause)

94.     Plaintiffs incorporate the allegations above as if fully made herein.

95.     Pursuant to Article I, Section 2, Clause 3 of the Constitution, as modified by the Fourteenth Amendment, "Representatives shall be apportioned among the several states according to their respective numbers, counting the whole number of persons in each state, excluding Indians not taxed." U.S. Const., amend. XIV, § 2.

96.     The Presidential Memorandum ignores the plain text of the Constitution and its mandate to count *the whole number of persons* which has always been understood to include non-citizens regardless of immigration status. It therefore violates the paramount constitutional objective of the decennial census under Article I, Section 2, Clause 3 and Section 2 of the Fourteenth Amendment to the Constitution: to count every person residing in the United States, citizen and non-citizen alike.

97.     Defendants' violations of the Apportionment Clause have caused and will continue to cause irreparable injuries to Plaintiffs. The requested declaratory and injunctive relief is substantially likely to redress these injuries.

## COUNT II
### (Violation of the Equal Protection Clause)

98.     Plaintiffs incorporate the allegations above as if fully made herein.

99.     The Fifth Amendment to the Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Implicit in this right is a guarantee that the federal government will not interfere with any person's enjoyment of the equal protection of the laws. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n.2 (1975).

100.     Just like the Fourteenth Amendment's equal protection clause, the Fifth Amendment guarantee of equal protection applies to "all persons within the territorial jurisdiction," of the United States, "without regard to any differences of race, of color, or of

27

nationality." *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). This includes non-citizens, "whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

101.    Implementation of the Presidential Memorandum will violate the Fifth Amendment's equal protection guarantee because it would result in fewer seats in the U.S. House of Representatives allocated to states with relatively smaller populations of non-Hispanic whites and relatively larger populations of non-whites, Hispanics, immigrants, and undocumented non-citizens—including California, Texas, and Florida—while awarding additional seats to states with relatively larger populations of non-Hispanic whites and relatively smaller populations of non-whites, Hispanics, immigrants, and undocumented non-citizens.

102.    The text of the Presidential Memorandum makes clear that this action is motivated by the desire to punish certain states that the President believes have "adopted policies that encourage illegal aliens to enter this country." Presidential Memorandum § 2. But the Constitution does not permit the President to dilute the political strength of millions of citizens based on state policies that favor immigrant communities.

103.    And because each state is allocated votes in the Electoral College based in part on the number of seats it holds in the House of Representatives, implementation of the Presidential Memorandum will weaken the relative voting strength of states with relatively smaller populations of non-Hispanic white residents and relatively larger populations of non-white residents, Hispanic residents, and undocumented non-citizen residents.

104.    Further, the Presidential Memorandum will artificially and disproportionately depress participation in the 2020 Census in communities with relatively larger numbers of Hispanics, immigrants, and undocumented non-citizens. The resulting undercount

will have ripple effects even beyond the House of Representatives and the Electoral College. It will substantially reduce the amount of federal funds distributed to states and localities where these undercounted groups comprise a relatively larger share of the population.

105.    These discriminatory results are not some unforeseen consequence of Defendants' actions. The very purpose of the Presidential Memorandum is to inflict these injuries on non-white, immigrant communities and the states in which they reside. Defendants' invidious intent is evident from their dogged efforts to include the citizenship question on the 2020 Census. Although Defendants initially defended their actions by claiming they were necessary to enforce the Voting Rights Act, they have now abandoned that pretextual façade. With their brass knuckles stripped bare, it is plain that Defendants main motivation is to artificially inflate the political power of non-Hispanic whites and to lock in those gains for at least the next decade.

106.    Defendants' violations of the Fifth Amendment's equal protection guarantee will cause irreparable injuries to Plaintiffs.  The requested declaratory and injunctive relief is substantially likely to redress these injuries.

### COUNT III
### (Violation of the Enumeration Clause)

107.    Plaintiffs incorporate the allegations above as if fully made herein.

108.    The Constitution requires that an "actual Enumeration" be conducted to ascertain the "whole number of persons in each State." U.S. Const. art. I, § 2, cl. 3; U.S. Const. amend. XIV, § 2.

109.    The exclusion of undocumented non-citizens from the apportionment base thus cannot be performed without reliance on non-Census data such as administrative records

"compiled *in connection with* the census" but not as part of the 2020 Census itself. *See* 2019

Executive Order (emphasis added).

110.   Defendants' reliance on non-census data for apportionment purposes, as

announced and directed by the Presidential Memorandum, violates the Enumeration Clause's

requirement that apportionment populations be determined through an "actual Enumeration"—

the decennial census.

111.   Defendants' violations of the Enumeration Clause have caused and will

continue to cause Plaintiffs' irreparable injuries. The requested declaratory and injunctive relief

is substantially likely to redress these injuries.

**COUNT IV**
**(Violation of 13 U.S.C. §§ 141, 195—Ultra Vires)**

112.   Plaintiffs incorporate the allegations above as if fully made herein.

113.   The Secretary of Commerce is required to "take a decennial census of

population" and report a "tabulation of total population by States . . . as required for the

apportionment of Representatives in Congress among the several States" to the President. 13

U.S.C. § 141(a), (b).

114.   The Presidential Memorandum violates this statutory requirement by

directing the Secretary of Commerce to report apportionment data other than a "tabulation of

total population."

115.   In his "determination of population for purposes of apportionment of

Representatives in Congress" as required by 13 U.S.C. § 141, the Secretary of Commerce cannot

make "use of the statistical method known as 'sampling.'" 13 U.S.C. § 195.

116.   Because the citizenship data to be compiled by the Secretary as directed

by the Presidential Memorandum is not collected through the decennial census itself, those data

30

are less complete than decennial census data by construction. The citizenship data thus pertains only to a subset—a sample—of the total population.

117.     The Presidential Memorandum violates 13 U.S.C. § 195 by directing the Secretary of Commerce to rely on statistical sampling in his determination of population for apportionment purposes.

118.     By disregarding the limitations imposed by 13 U.S.C. § 141 and § 195, Defendants are acting *ultra vires*.

119.     Defendants' *ultra vires* acts in violation of 13 U.S.C. § 141 and § 195 have caused and will continue to cause Plaintiffs' irreparable injuries. The requested declaratory and injunctive relief is substantially likely to redress these injuries.

### COUNT V
### (Violation of 2 U.S.C § 2a—Ultra Vires)

120.     Plaintiffs incorporate the allegations above as if fully made herein.

121.     The President is required by statute to transmit a reapportionment statement "showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census." 2 U.S.C. § 2a(a).

122.     The Presidential Memorandum violates this statutory requirement by causing the President to transmit a reapportionment statement that excludes undocumented non-citizens and thus does not show "the whole number of persons in each State."

123.     The Presidential Memorandum further violates this statutory requirement by causing the President to transmit a reapportionment statement incorporating data that was not "ascertained under the . . . decennial census," citizenship information compiled by Secretary of Commerce through administrative records.

124. By disregarding the limitations imposed by 2 U.S.C. § 2a, the President is acting *ultra vires*.

125. The President's *ultra vires* acts in violation of 2 U.S.C. § 2a has caused and will continue to cause Plaintiffs' irreparable injuries. The requested declaratory and injunctive relief is substantially likely to redress these injuries.

**COUNT VI**
**(Violation of the Administrative Procedure Act)**

126. Plaintiffs incorporate the allegations above as if fully made herein.

127. As federal administrative agencies, the Department of Commerce and the Census Bureau are subject to the Administrative Procedure Act ("APA"). 5 U.S.C. § 701(b)(1).

128. Upon information and belief, following receipt of the Presidential Memorandum, the Department of Commerce has issued (or will imminently issue) directives to the Census Bureau, constituting final agency action, to implement the policy of excluding undocumented non-citizens from the decennial census count used for congressional apportionment, as set forth in the Presidential Memorandum.

129. The APA requires courts to find unlawful and set aside any final agency action that is, *inter alia*, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "contrary to constitutional right, power, privilege or immunity," *id.* § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D).

130. Defendants' implementation of the Presidential Memorandum is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law; contrary to

constitutional right, power, privilege or immunity; in excess of statutory jurisdiction and authority; and without observance of procedure required by law.

131.    Defendants' implementation of the Presidential Memorandum is contrary to constitutional right, power, privilege or immunity, and therefore violates the APA, because it contravenes the unambiguous command, first articulated in Article I, Section 2, Clause 3 of the Constitution and revised by the Fourteenth Amendment, that the "whole number of persons in each State" be counted for the apportionment of congressional seats pursuant to an "actual Enumeration." 5 U.S.C. § 706(2)(B).

132.    Defendants' implementation of the Presidential Memorandum is in excess of clear statutory authority because the Census Act requires the Secretary of Commerce to report a "tabulation of total population by States" and forbids him from relying on statistical sampling for purposes of reporting population figures to be used for congressional apportionment. *Id.* § 706(2)(C).

133.    Defendants' implementation of the Presidential Memorandum also departs from longstanding policy without any reasoned basis and disregards the lack of reliable statistical methods to exclude undocumented individuals—identified through administrative records collected outside the decennial census process—from the apportionment base. In addition, contrary to the requirements of OMB policy directives and Census Bureau governing guidelines, the data collected by the Census Bureau about undocumented non-citizens pursuant to the Presidential Memorandum will not be reliable, clear, or complete. This is arbitrary and capricious and violates the APA. 5 U.S.C. § 706(2)(A).

134.    Defendants' implementation of the Presidential Memorandum further contravenes the APA because it departs from the 2020 Residence Rule that the Census Bureau

33

adopted after notice-and-comment rulemaking without observance of the procedure required by law. *Id.* § 706(2)(D).

   135. The implementation of the Presidential Memorandum has harmed and will continue to harm Plaintiffs unless Defendants' unlawful actions are set aside pursuant to § 706 of the APA.

## **PRAYER FOR RELIEF**

   136. WHEREFORE, Plaintiffs pray that the Court:

   a. Declare that Defendants' exclusion of undocumented non-citizens from the apportionment base, as announced and directed by the Presidential Memorandum, violates Article I, Section 2, Clause 3 of the Constitution and the Fifth and Fourteenth Amendments to the Constitution.

   b. Declare that Defendants' exclusion of undocumented non-citizens from the apportionment base, as announced and directed by the Presidential Memorandum, violates 2 U.S.C. § 2a and the Census Act, including 13 U.S.C. §§ 141, 195.

   c. Declare that Defendants' implementation of the Presidential Memorandum and exclusion of undocumented non-citizens from the apportionment base and any implementing actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction and authority; and without observance of procedure required by law, in violation of § 706(2)(A)–(D) of the APA.

d.   Declare that any reapportionment statement sent from the President to Congress excluding undocumented non-citizens residing in the United States from the apportionment base is void;

e.   Mandate that the Secretary of Commerce tabulate and report the total population by states under 13 U.S.C. § 141(b) based solely on the total number of residents in each state, including undocumented non-citizens, and without providing information about the number of undocumented non-citizens in each state;

f.   Mandate that the President transmit to the Congress a statement of the whole number of persons in each State and the number of Representatives to which each State would be entitled under an apportionment of the then-existing number of Representatives by the method known as the method of equal proportions based on the total number of residents of each state, including undocumented non-citizens;

g.   Preliminarily and permanently enjoin Defendants and all those acting in concert with them from excluding undocumented non-citizens from the apportionment base and from taking any actions to implement or further such exclusion;

h.   Award Plaintiffs reasonable costs, expenses, and attorney's fees, pursuant to 28 U.S.C. § 2412; and

i.   Award such additional relief as the interests of justice may require.

Date: July 31, 2020                    Respectfully submitted,

  /s/ Daniel Grant
Daniel Grant (Bar No. 19659)
Shankar Duraiswamy*
Carlton Forbes*
Jeffrey Cao*
Morgan Saunders*
Patricio Martínez-Llompart*
COVINGTON & BURLING LLP
One City Center
850 10th Street, NW
Washington, D.C. 20001
Tel: (202) 662-6000
Fax: (202) 662-6302
dgrant@cov.com
sduraiswamy@cov.com
cforbes@cov.com
jcao@cov.com
msaunders@cov.com
pmartinezllompart@cov.com

P. Benjamin Duke*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000
Fax: (212) 841-1010
pbduke@cov.com

*Attorneys for Plaintiffs*

* *pro hac vice* application forthcoming