**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

NATALIA USECHE, *et al.*,

                    Plaintiffs,

          v.                         Case No. 8:20-cv-2225-PX

DONALD J. TRUMP, *et al.*,

                    Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**
**<u>OR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

Introduction ........................................................................................................................ 1

Background ........................................................................................................................ 2

    A.     Legal Framework Governing Apportionment and the Decennial Census. ............ 2

    B.     The July 21, 2020 Memorandum. .......................................................................... 4

    C.     The Trump Administration's Efforts to Use the 2020 Census to Shift
           Political Power to Non-Hispanic Whites. ............................................................. 5

    D.     Plaintiffs' Injuries Resulting from the Memorandum. ........................................... 6

Argument ........................................................................................................................... 7

I.     The Memorandum Violates the Constitution and the Statutes Governing
      Apportionment and the Census, Entitling Plaintiffs to Summary Judgment. .................... 7

    A.     The Memorandum Violates Constitutional and Statutory Commands to
           Base Apportionment Upon the "Whole Number of Persons in Each State,"
           Without Consideration of Citizenship or Immigration Status. .............................. 8

         1.     Constitutional Text and History Make Clear That Immigration
                Status Cannot Be Used To Exclude Anyone From the
                Apportionment Base. ................................................................................. 9

         2.     The Statutory Framework Implements the Constitutional Mandate
                 and Bars Any Presidential Discretion With Respect to the
                Apportionment Base. ............................................................................... 13

         3.     The Memorandum's Legal and Policy Assertions Have No Merit........... 15

    B.     The Memorandum Violates Constitutional and Statutory Requirements
           that Apportionment Be Based Only on the Decennial Census. ............................ 18

II.    Plaintiffs are Entitled to a Preliminary Injunction in the Alternative. .............................. 20

    A.     Plaintiffs Are, at Minimum, Likely to Succeed on the Merits of Their
           Claims. .................................................................................................................. 21

    B.     Plaintiffs Are Likely to Suffer Irreparable Harm Absent an Injunction. .............. 24

         1.     The Individual Plaintiffs Will Be Irreparably Harmed by the Loss
                of Representation to Which They are Constitutionally Entitled. .............. 26

2.      The Individual Plaintiffs Will Be Irreparably Harmed by a
        Magnified Undercount that Further Dilutes Their Votes and
        Reduces Federal Funding to Their Areas.................................................. 28

3.      The Organizational Plaintiffs Are Harmed by the Memorandum's
        Interference with and Impediment of Their Organizational
        Activities. ............................................................................................... 32

C.      The Balance of the Equities and the Public Interest Support an Injunction. ........ 35

Conclusion ............................................................................................................................ 35

## TABLE OF AUTHORITIES

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ............................................................................22

*Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*,
    801 F. Supp. 2d 383 (D. Md. 2011) ...............................................15, 19

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..............................................................................8

*Baker v. Carr*,
    369 U.S. 186 (1962) ............................................................................27

*Carey v. Klutznick*,
    637 F.2d 834 (2d Cir. 1980) ................................................27, 30, 35

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017) ...............................................................32

*Centro Tepeyac v. Montgomery County*,
    722 F.3d 184 (4th Cir. 2013) ..............................................................35

*Chamber of Commerce v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ...........................................................15

*Cole v. Ruidoso Mun. Sch.*,
    43 F.3d 1373 (10th Cir. 1994) ...........................................................24

*Coreas v. Bounds*,
    2020 WL 1663133 (D. Md. Apr. 3, 2020) .........................................25

*Davis v. District of Columbia*,
    158 F.3d 1342 (D.C. Cir. 1998) .........................................................25

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) .................................................................*passim*

*Dep't of Commerce v. U.S. House of Representatives*,
    525 U.S. 316 (1999) ....................................................................*passim*

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ..............................................................25

*E. Bay Sanctuary Covenant v. Barr*,
    964 F.3d 832 (9th Cir. 2020) ..............................................................35

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*,
    630 F.3d 1153 (9th Cir. 2011) ...........................................................34

*Evenwel v. Abbott*,
    136 S. Ct. 1120 (2016) ...................................................................................9, 17

*Fed. Fin. Co. v. Hall*,
    108 F.3d 46 (4th Cir. 1997) ...........................................................................14, 15

*Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*,
    486 F. Supp. 564 (D.D.C. 1980) ....................................................... *passim*

*Fitisemanu v. United States*,
    426 F. Supp. 3d 1155 (D. Utah 2019) .............................................................10

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) .......................................................................... *passim*

*Garza v. County of Los Angeles*,
    918 F.2d 763 (9th Cir. 1990) ...........................................................................11

*Glavin v. Clinton*,
    19 F. Supp. 2d 543 (E.D. Va. 1998) ............................................................6, 30

*Hadley v. Junior Coll. Dist. of Metro. Kan. City*,
    397 U.S. 50 (1970) ..........................................................................................23

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) ........................................................................................21

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ..........................................................................................7

*Jones v. United States*,
    526 U.S. 227 (1999) ........................................................................................14

*Kravitz v. U.S. Dep't of Commerce*,
    366 F. Supp. 3d 681 (D. Md. 2019) ................................................... *passim*

*Kravitz v. U.S. Dep't of Commerce*,
    382 F. Supp. 3d 393 (D. Md. 2019) .........................................................5, 6, 23

*League of Women Voters of Fla. v. Browning*,
    863 F. Supp. 2d 1155 (N.D. Fla. 2012) ...........................................................34

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ............................................................................35

*Lee v. Va. State Bd. of Elections*,
    843 F.3d 592 (4th Cir. 2016) ...........................................................................22

*Make the Rd. N.Y. v. McAleenan*,
    405 F. Supp. 3d 1 (D.D.C. 2019) ............................................................................17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*,
    756 F.2d 1048 (4th Cir. 1985) .......................................................................25, 31

*Morgan Keegan & Co. v. Louise Silverman Trust*,
    2012 WL 113400 (D. Md. Jan. 12, 2012) .............................................................25

*Mountain States Legal Found. v. Bush*,
    306 F.3d 1132 (D.C. Cir. 2002) .....................................................................15, 19

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010)....................................................................................25

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
    22 F.3d 546 (4th Cir. 1994) ...........................................................................25, 32

*N.C. State Conference of the NAACP v. McCrory*,
    831 F.3d 204 (4th Cir. 2016) ...............................................................................21

*New York v. U.S. Dep't of Commerce*,
    351 F. Supp. 3d 502 (S.D.N.Y. 2019)............................................................ *passim*

*Nken v. Holder*,
    556 U.S. 418 (2009)..............................................................................................35

*NLRB v. Enter. Leasing Co. Se.*,
    722 F.3d 609 (4th Cir. 2013) .................................................................................9

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ...............................................................................21

*Plyler v. Doe*,
    457 U.S. 202 (1982)........................................................................................9, 17

*PSINet, Inc. v. Chapman*,
    362 F.3d 227 (4th Cir. 2004) .................................................................................8

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)..............................................................................................24

*Reynolds v. Sims*,
    377 U.S. 533 (1964)........................................................................................22, 27

*Ross v. Meese*,
    818 F.2d 1132 (4th Cir. 1987) .............................................................................25

*Rust v. Sullivan*,
    500 U.S. 173 (1991) ............................................................................................14

*Scotts Co. v. United Indus. Corp.*,
    315 F.3d 264 (4th Cir. 2002) .............................................................................24

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ...........................................................................................25

*Twyman v. Rockville Hous. Auth.*,
    99 F.R.D. 314 (D. Md. 1983) ...........................................................................25

*U.S. House of Representatives v. U.S. Dep't of Commerce*,
    11 F. Supp. 2d 76 (D.D.C. 1998) ...........................................................18, 27, 32

*United States v. Simms*,
    914 F.3d 229 (4th Cir. 2019) (en banc) .............................................................13

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...................................................................................21, 22, 27

*Wesberry v. Sanders*,
    376 U.S. 1 (1964) .........................................................................................10, 27

*Williams v. N.Y. State Office of Mental Health*,
    2011 WL 2708378 (E.D.N.Y. July 11, 2011) ...................................................25

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .........................................................................................20, 24

THE CONSTITUTION, STATUTES, AND RULES

U.S. Const. art. I, § 2 .............................................................................................. *passim*

U.S. Const. art. II, § 1, cl. 2 ...................................................................................22

U.S. Const. amend. XIV, § 2 ...................................................................................*passim*

2 U.S.C. § 2a ..........................................................................................................*passim*

13 U.S.C. § 2 ...........................................................................................................3

13 U.S.C. § 4 ...........................................................................................................3

13 U.S.C. § 141 .......................................................................................................*passim*

13 U.S.C. § 183(a) ...................................................................................................31

23 U.S.C. § 133(d) ...................................................................................................31

42 U.S.C. § 1397b(b) ...................................................................................................30

Pub. L. No. 83-740, 68 Stat. 1012 (1954)...................................................................14

Fed. R. Civ. P. 56 .........................................................................................................8

**EXECUTIVE AND ADMINISTRATIVE MATERIALS**

*Final 2020 Census Residence Criteria and Residence Situations*,
   83 Fed. Reg. 5525 (Feb. 8, 2018) ..................................................... *passim*

Executive Order 13880, *Collecting Information About Citizenship Status in
   Connection with the Decennial Census*, 84 Fed. Reg. 33821 (July 11, 2019)................. *passim*

*Excluding Illegal Aliens From the Apportionment Base Following the 2020
   Census*, 85 Fed. Reg. 44679 (July 23, 2020) ................................................ *passim*

**LEGISLATIVE MATERIALS**

1 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ..........................10, 11

Cong. Globe, 39th Cong., 1st Sess. (1866)...................................................................10, 11

71 Cong. Rec. 1822 (1929) .........................................................................................14

71 Cong. Rec. 1910 (1929) .........................................................................................12

71 Cong. Rec. 1958 (1929) .........................................................................................12

71 Cong. Rec. 2451 (1929) .........................................................................................12

H.R. Rep. No. 1787 (1940) .........................................................................................12

96 Cong. Rec. 10 (1980) .............................................................................................12

135 Cong. Rec. S12234 (1989).....................................................................................13

*Counting Every Person: Hearing on Presidential Memorandum Before the House
   Oversight Committee*, 116th Cong. (July 29, 2020),
   https://docs.house.gov/meetings/GO/GO00/20200729/110948/
   HHRG-116-GO00-Wstate-ThompsonJ-20200729.pdf........................................................29

**COURT FILINGS**

Defs.' Reply Mem. of Points & Opp'n to Pls.' Mot. for Summ. J. at 4,
   *FAIR v. Klutznick*, 486 F. Supp. 564 (D.D.C. Jan. 3, 1980) (No. 79-3269),
   1980 WL 683642 .......................................................................................12, 13

Pls.' Mot. for Order to Show Cause Ex. D, *New York v. Dep't of Commerce*,
No. 18-CV-2921 (S.D.N.Y. May 31, 2019), ECF No. 595-1 ..............................................5, 23

Letter to Judge Furman, *New York v. Trump*,
No. 1:20-cv-5770 (S.D.N.Y. Aug. 3, 2020), ECF No. 37 ......................................................20

## OTHER AUTHORITIES

Benjamin B. Kendrick, *The Journal of the Joint Committee of Fifteen on
Reconstruction*, 39th Congress, 1865-1867, 49-52..................................................................11

*Black's Law Dictionary* (11th ed. 2019).....................................................................................14

Bryan Lowry, *That Citizenship Question on the 2020 Census? Kobach Says He
Pitched It to Trump*,
https://www.kansascity.com/news/politics-government/article207007581.html ...................23

Cambridge Dictionary, *Inhabitant*,
https://dictionary.cambridge.org/us/dictionary/english/inhabitant ........................................16

Merriam-Webster Dictionary, *Inhabitant*,
https://www.merriam-webster.com/dictionary/inhabitant ......................................................16

U.S. Census Bureau, *Census Informational Bilingual Questionnaire* (Mar. 7,
2020), https://www2.census.gov/programs-surveys/decennial/2020/technical-
documentation/ questionnaires-and-instructions/questionnaires/2020-
informational-questionnaire.pd ............................................................................................20

U.S. Census Bureau, *State Population by Characteristics: 2010-2019*,
https://www.census.gov/ data/tables/time-series/demo/popest/2010s-state-
detail.htm ..............................................................................................................................22

Wilbur Ross, Reinstatement of a Citizenship Question on the 2020 Decennial
Census Questionnaire (Mar. 26, 2018),
https://www.commerce.gov/sites/default/files/2018-03-26_2.pdf...........................................6

## INTRODUCTION

On July 21, 2020, President Donald Trump issued a Presidential Memorandum announcing an overt "policy" and intention to violate the U.S. Constitution by categorically excluding "illegal aliens" from the population counts used to apportion the number of congressional seats (and electoral college votes) to which each state is entitled. *Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census*, 85 Fed. Reg. 44679 (July 23, 2020) (the "Memorandum"). For over two centuries, all three branches of the government have honored and upheld the fundamental constitutional principle that such apportionment must be based upon the number of *all* persons residing in the United States—regardless of their immigration status—as ascertained by the decennial census. In furtherance of a long-running scheme to dilute the political power of racial and ethnic minorities, the Memorandum thumbs its nose at the plain language of the Constitution, and at the rock-solid bulwark of statutory law, judicial precedent, and centuries of established practice that cements it.

In the face of this contemptuous gambit, Plaintiffs filed this action to preserve their fundamental rights to representation under the Constitution and to stop Defendants from implementing the President's *ultra vires* decree. Under the Apportionment Clause of the Fourteenth Amendment, it is beyond dispute that the "persons in each State" who must be counted in the apportionment base include both citizens and non-citizens irrespective of legal status. U.S. Const. amend. XIV, § 2. This population count must be ascertained through the decennial census mandated by the Enumeration Clause, U.S. Const. art I, § 2, cl. 3, and as the U.S. Supreme Court determined in 2019—after a battle that Defendants fought and lost in multiple jurisdictions, including this Court—the 2020 Census will *not* ask anyone about their citizenship or distinguish between citizens and non-citizens, regardless of whether their presence is legally authorized or not. *See Dep't of Commerce v. New York* ("*New York II*"), 139 S. Ct. 2551 (2019); Executive Order

13880, *Collecting Information About Citizenship Status in Connection with the Decennial Census*, 84 Fed. Reg. 33821 (July 11, 2019) ("2019 Executive Order"). Buttressing the constitutional edifice is a statutory structure under the Census Act, 13 U.S.C. § 141, and 2 U.S.C. § 2a, which remove all doubt that the President has no discretion to deviate from the total population figures ascertained by the decennial census or rely on other data sources.

Ignoring this precedent, the Memorandum announces a blatantly unlawful objective— excluding undocumented immigrants from the apportionment base—that can be accomplished only by unlawful means—substituting alternative population counts for those actually generated by the decennial census. This Court should grant summary judgment in Plaintiffs' favor on their claims under the above constitutional and statutory provisions and permanently enjoin Defendants from implementing the Memorandum.

In the alternative and at a minimum, the Court should issue a preliminary injunction on the above claims and Plaintiffs' Equal Protection claim, because Plaintiffs are likely to prevail on the merits and are suffering actual or imminent irreparable harm. The Memorandum could not have been better calculated to sow fear among undocumented immigrants and whip up xenophobic frenzy against them. The deterrent effect on participation in the 2020 Census currently underway is unmistakable and severe. A preliminary injunction should be entered to avert ongoing and immediate harm while this action is pending.

## BACKGROUND

### A.     Legal Framework Governing Apportionment and the Decennial Census.

The Fourteenth Amendment provides that congressional "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole numbers of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2 (the "Apportionment Clause"). The Constitution further requires that "the whole number of persons"

be determined through an "actual Enumeration" every ten years "in such Manner as [Congress] shall by Law direct." U.S. Const. art. I, § 2, cl. 3 (the "Enumeration Clause").

Exercising this power, Congress enacted the Census Act, which directs the Secretary of Commerce to take the constitutionally-mandated "decennial census of population," 13 U.S.C. § 141(a), and governs the timing and procedure for doing so. The Secretary is bound to "perform the functions and duties imposed upon him by [Title 13]," 13 U.S.C. § 4, and may delegate those responsibilities to the Census Bureau, *id.* §§ 2, 4, but has no discretion or authority in conducting the decennial census beyond that conferred by the Census Act itself. *See, e.g.*, *Dep't of Commerce v. U.S. House of Representatives* ("*Commerce v. House*"), 525 U.S. 316, 334-44 (1999).

The Secretary is required to report to the President by January 1, 2021, "[t]he tabulation of total population by States" under the decennial census "as required for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b). The President is then required to "transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population" and "the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member." 2 U.S.C. § 2a(a). This Presidential duty is "ministerial." *See Franklin v. Massachusetts*, 505 U.S. 788, 799 (1992). The President has no discretion in calculating "[t]he number of Representatives to which each State would be entitled" based upon the "whole number of persons in each State." *See id.*

On February 8, 2018, the Department of Commerce issued the Final 2020 Census Residence Criteria and Residence Situations ("Residence Rule"), 83 Fed. Reg. 5525 (Feb. 8, 2018). The Residence Rule, which was promulgated pursuant to formal notice-and-comment rulemaking

procedures, "determine[s] where people are counted during each decennial census." *Id.* at 5526. "[G]uided by the constitutional and statutory mandates to count all residents of the several states," and consistent with over two centuries of practice, the Residence Rule provides that the decennial census will count all individuals whose "usual residence"—*i.e.*, "the place where a person lives and sleeps most of the time"—is in a given state. *Id.* In particular, it makes clear that undocumented immigrants and other "citizens of foreign countries living in the United States" must be "[c]ounted at the U.S. residence where they live and sleep most of the time." *Id.* at 5533. The population figures "ascertained under . . . the decennial census," 2 U.S.C. § 2a(a), therefore includes all inhabitants of every State, regardless of their citizenship or immigration status.

### B.     The July 21, 2020 Memorandum.

On July 21, 2020, President Trump issued the Memorandum. While paying lip service to the requirement that the government conduct a decennial census that enumerates the "whole number of persons in each State," the Memorandum claims that the President has discretion to determine "which persons should be considered 'inhabitants'" of the States for purposes of that enumeration. Memorandum § 1. The Memorandum nakedly alleges that this discretion extends so far as to allow the President to "exclude from the apportionment base aliens who are not in a lawful immigration status," citing no legal authority justifying this startling claim of apportionment by executive fiat. *Id.* The Memorandum simply asserts that excluding undocumented non-citizens would be "more consonant with the principles of representative democracy" and would avoid "reward[ing]" unnamed states that President Trump claims have "adopt[ed] policies that encourage illegal aliens to enter this country." *Id.* § 2.

Relying on only this slim reed, the Memorandum directs the Secretary of Commerce to provide information to the President that will allow him to exclude all undocumented non-citizens from the apportionment base. *Id.* § 3. In doing so, the Memorandum expressly references a 2019

Executive Order that directed the Department of Commerce to compile data on the number of "illegal aliens" in the country. *Id.* § 1 (citing 2019 Executive Order). The 2019 Executive Order claimed that gathering such data could assist states to exclude undocumented immigrants in redistricting, 2019 Executive Order § 1, thus diluting the political power of immigrant communities within those states.

### C. The Trump Administration's Efforts to Use the 2020 Census to Shift Political Power to Non-Hispanic Whites.

The Memorandum is only the latest step in an ongoing campaign to weaken the political power of non-white Hispanic communities. From the outset of the Trump presidency, members of his administration have coordinated with right-wing activists, including Kris Kobach and Thomas Hofeller, on how to use the 2020 Census to exclude certain groups from the population counts used to allocate political representation based on their citizenship and immigration status—a scheme that would be "be advantageous" to "Non-Hispanic Whites." Pls.' Mot. for Order to Show Cause Ex. D at 9, *New York v. Dep't of Commerce*, No. 18-CV-2921 (S.D.N.Y. May 31, 2019), ECF No. 595-1. Hofeller worked with advisors to Secretary Ross and President Trump to ghostwrite a letter from the Department of Justice ("DOJ") to the Department of Commerce purporting to request the inclusion of a citizenship question on the 2020 Census. *Kravitz v. U.S. Dep't of Commerce* ("*Kravitz II*"), 382 F. Supp. 3d 393, 398-400 (D. Md. 2019); *New York v. U.S. Dep't of Commerce* ("*New York I*"), 351 F. Supp. 3d 502, 556-57 (S.D.N.Y. 2019), *aff'd in part, rev'd in part, and remanded sub nom. Dep't of Commerce v. New York*, 139 S. Ct. 2551. The letter claimed citizenship data would assist DOJ in complying with its obligations under the Voting Rights Act ("VRA"). *Kravitz v. U.S. Dep't of Commerce* ("*Kravitz I*"), 366 F. Supp. 3d 681, 698 (D. Md. 2019). As subsequent events made clear, this explanation was pretext to hide Defendants' discriminatory goal: suppressing the political power of non-white Hispanic communities.

When Secretary Ross announced that the Administration planned to include a citizenship question on the 2020 Census, he parroted the pretextual rationale that DOJ needed the data to enforce the VRA.[1] Litigation challenging the inclusion of the citizenship question followed, and several courts—including Judge Hazel of this Court—agreed that the Department's announced action violated the Administrative Procedure Act. *See Kravitz I*, 366 F. Supp. 3d at 756. Ultimately, the Supreme Court found that the Department's explanation that citizenship data would aid with implementing the VRA was "contrived" and "incongruent with what the record reveal[ed] about the agency's priorities and decisionmaking process." *New York II*, 139 S. Ct. at 2575.

Details of Hofeller's hidden campaign to dilute the votes of diverse communities came to light only after multiple district courts had enjoined the Department of Commerce from proceeding with a citizenship question in the 2020 Census. Upon discovery of documents from Hofeller's files, Judge Hazel indicated he would reconsider his prior ruling rejecting plaintiffs' equal protection challenge to the citizenship question because the "new evidence potentially connects the dots between a discriminatory purpose—diluting Hispanics' political power—and Secretary Ross's decision." *Kravitz II*, 382 F. Supp. 3d at 400. Despite this, Defendants have barreled ahead with their effort to dilute the political power of non-white immigrant communities.

### D.   Plaintiffs' Injuries Resulting from the Memorandum.

The Individual Plaintiffs—11 citizens and registered voters residing in California, Florida, Nevada, New Jersey, New York, and Texas—bring this action to vindicate their "plain, direct and adequate interest in maintaining the effectiveness of their votes," *Commerce v. House*, 525 U.S. at 331-32 (citations omitted), and to ensure their areas experience no "loss of federal funding," *Glavin*

---

[1] *See* Wilbur Ross, Reinstatement of a Citizenship Question on the 2020 Decennial Census Questionnaire (Mar. 26, 2018), https://www.commerce.gov/sites/default/files/2018-03-26_2.pdf.

*v. Clinton*, 19 F. Supp. 2d 543, 548 (E.D. Va. 1998) (three-judge panel), *aff'd sub nom. Commerce v. House*, 525 U.S. 316. The apportionment policy announced in the Memorandum will dilute many of the Individual Plaintiffs' votes by depriving their states of the congressional seats to which they are constitutionally entitled. Meanwhile, the Memorandum itself is already inflicting injury on the Individual Plaintiffs by another means: suppressing Census participation and thereby causing a disproportionate Census undercount in their communities. *See* Barreto Decl. ¶ 71; Gilgenbach Decl. ¶¶ 33, 43-49. This undercount will have an independent vote dilution effect because it will cause the Individual Plaintiffs to be drawn into overpopulated voting districts through the *intra-state* redistricting process. And because many federal programs use Census population counts in their funding formulas, a disproportionate undercount will also cause an under-allocation of funding to Plaintiffs' states and localities.

The Organizational Plaintiffs—two nonprofit membership organizations based in Arizona and Florida that each seek to promote participation in the 2020 Census—bring this action not only on behalf of their members who are injured "in their own right" in a manner similar to the Individual Plaintiffs, *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977), but also on their own behalf. The Memorandum directly injures the Organizational Plaintiffs by undermining their Census outreach efforts, frustrating their organizational purpose of promoting participation, and requiring them to divert resources to mitigate its effects. *See* Gilfillan Decl. ¶¶ 7-16; Rodriguez Decl. ¶¶ 7-10; *see also Kravitz I*, 366 F. Supp. 3d at 741-42.

## ARGUMENT

### I.   The Memorandum Violates the Constitution and the Statutes Governing Apportionment and the Census, Entitling Plaintiffs to Summary Judgment.

A party may seek summary judgment "at any time until 30 days after the close of all discovery," and "[t]he court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), (b). A fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "All facts and reasonable inferences must be interpreted in the light most favorable to the non-moving party," but summary judgment is nonetheless "appropriate where the facts and the law will reasonably support only one conclusion." *PSINet, Inc. v. Chapman*, 362 F.3d 227, 233 (4th Cir. 2004).

Here, the facts and law support only one conclusion: that the exclusion of undocumented immigrants directed by the Memorandum violates constitutional and statutory requirements governing both *who* must be counted for apportionment and *how* that count must be conducted.

A.   **The Memorandum Violates Constitutional and Statutory Commands to Base Apportionment Upon the "Whole Number of Persons in Each State," Without Consideration of Citizenship or Immigration Status.**

The Apportionment Clause mandates that congressional apportionment must be determined based on the population of the States, "counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend. XIV, § 2. The plain language of the Constitution, the drafting history of both the Apportionment Clause and its predecessor provision in the original Constitution, and over two centuries of settled constitutional law and understanding all confirm that the phrase "persons in each State" *includes* undocumented non-citizens. This longstanding understanding of the Apportionment Clause is also reflected in 2 U.S.C. § 2a(a)'s directive that the President must transmit an apportionment statement "showing the whole numbers of persons in each State, excluding Indians not taxed." Because the Memorandum flouts this bedrock constitutional meaning and announces an express intention and purported "policy" to violate the Apportionment Clause, it is plainly unlawful.

8

      1.      **Constitutional Text and History Make Clear That Immigration Status Cannot Be Used To Exclude Anyone From the Apportionment Base.**

As the Supreme Court held long ago, the word "persons" in the Fourteenth Amendment means *all* people, "[w]hatever [their] status under the immigration laws." *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *see also Fed'n for Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 576 (D.D.C. 1980) (undocumented immigrants "are clearly 'persons'" under the Apportionment Clause). The Apportionment Clause embodies a representational principle based on the understanding that "representatives serve all residents, not just those eligible or registered to vote." *Evenwel v. Abbott*, 136 S. Ct. 1120, 1132 (2016). *All* persons must be counted so that *all* persons are represented. The Apportionment Clause thus requires that "all inhabitants" of the States must be counted for purposes of determining the apportionment base. *Id.* at 1127-28. Provided their "usual residence" is in the United States, they must be included in the enumeration of the population and the apportionment of House seats. *See Franklin*, 505 U.S. at 804-06.

This plain meaning of "person" in the Apportionment Clause is underscored by the constitutional text as a whole. The Framers used restrictive references to "citizens" elsewhere in the Constitution. For example, Section 2 of the Fourteenth Amendment provides that the apportionment basis shall be reduced in proportion to "the number of . . . male citizens" denied "the right to vote." *See* U.S. Const. amend. XIV, § 2. And Article 1, Section 2 requires members of the House of Representatives to have "been seven Years a Citizen." U.S. Const. art. I, § 2, cl. 2; *cf. NLRB v. Enter. Leasing Co. Se.*, 722 F.3d 609, 633 (4th Cir. 2013) ("When interpreting the text of the Constitution, we . . . presum[e] that every word . . . has independent meaning."). Moreover, when the drafters of the Fourteenth Amendment intended to exclude a subset of persons, they did so explicitly—as with "Indians not taxed." The plain meaning of the

Apportionment Clause thus refutes any suggestion that undocumented aliens may be excluded from the "whole number of persons" counted for purposes of congressional apportionment.

The drafting history of the Apportionment Clause confirms this plain meaning. The predecessor of the Apportionment Clause, U.S. Const. art. I, § 2, included in the apportionment base "the whole Number of *free* Persons" and "three fifths of all *other* Persons"—a reference to enslaved people, who were deprived of citizenship as a matter of law. *See Fitisemanu v. United States*, 426 F. Supp. 3d 1155, 1163-64 (D. Utah 2019). The Fourteenth Amendment ultimately removed this infamous distinction. But the fact that the Framers explicitly *included* slaves— quintessential non-citizens—demonstrates the original intention even at the Founding to count all natural persons, regardless of citizenship or other status, in the apportionment base. "By making express provision for Indians and slaves, the Framers demonstrated their awareness" that the language would otherwise "be all-inclusive." *FAIR*, 486 F. Supp. at 576.

Indeed, "[t]he debates at the [Constitutional] Convention make at least one fact abundantly clear: . . . when the delegates agreed that the House should represent 'people' they intended that in allocating Congressmen the number assigned to each State should be determined solely by the number of the State's inhabitants." *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964). The Founders considered restricting apportionment to only citizens or property owners, but expressly rejected that approach. *See* 1 *The Records of the Federal Convention of 1787*, at 542 (Max Farrand ed., 1911) ("Farrand's Records") (remarks of Pierce Butler); Cong. Globe, 39th Cong., 1st Sess. 141 (1866) (remarks of Rep. Blaine). They intended the House to be "be the most exact transcript of the whole Society," 1 Farrand's Records 132 (James Wilson), one that represented "every individual of the community at large," *id.* at 473 (Alexander Hamilton). As James Madison explained, "[i]t is a fundamental principle of the proposed Constitution" that "the aggregate

10

number of representatives allotted to the several States, is to be . . . founded on the aggregate number of inhabitants." The Federalist No. 54 (James Madison). The Founders "were aware that [the] apportionment and representation base would include categories of persons who were ineligible to vote—women, children, bound servants, convicts, the insane, and, at a later time, aliens. Nevertheless, they declared that government should represent *all* the people." *Garza v. County of Los Angeles*, 918 F.2d 763, 774 (9th Cir. 1990) (citing *FAIR*, 486 F. Supp. at 576).

The drafters of the Fourteenth Amendment likewise considered and rejected proposals limiting the apportionment base to citizens. *See* Benjamin B. Kendrick, *The Journal of the Joint Committee of Fifteen on Reconstruction*, 39th Congress, 1865-1867, 49-52. During negotiations, the drafters acknowledged that limiting apportionment to citizens "would narrow the basis of taxation and cause considerable inequalities . . . because the number of aliens in some States [was] very large." Cong. Globe, 39th Cong., 1st Sess. 359 (1866). As Representative John Bingham explained, the "whole immigrant population should be numbered with the people and counted as part of them" because "[u]nder the Constitution as it now is and as it always has been, the entire immigrant population of this country is included in the basis of representation." *Id.* at 432.

Including immigrant populations in the apportionment base thus is not an unforeseen consequence of the constitutional text. To the contrary, the drafters of the Fourteenth Amendment were well aware that some states had large immigrant populations, and they nevertheless chose to continue basing apportionment on total population. They purposely included all natural persons, including immigrant non-citizens, in the apportionment base because members of the House of Representatives represent *all* people in their districts. *See* Cong. Globe, 39th Cong., 1st Sess. 141 (1866) (Rep. James G. Blaine) ("As an abstract proposition[,] no one will deny that population is

11

the true basis of representation; for women, children, and other non-voting classes may have as vital an interest in the legislation of the country as those who actually deposit the ballot.").

Since the adoption of the Fourteenth Amendment, Congress and the Executive Branch have both consistently rejected efforts to exclude noncitizens or undocumented immigrants from the apportionment base. In 1929, Congress rejected proposals to amend the Census Act to exclude noncitizens from apportionment because, in the view of many members of Congress, "the plain mandate of the Constitution" requires counting all persons, including noncitizens. 71 Cong. Rec. 1910 (May 25, 1929) (Sen. Bratton); *see, e.g.*, *id.* at 1958 (May 27, 1929) (Sen. Reed); *id.* at 2451-52 (June 6, 1929) (Rep. Griffith). In 1940, Congress again rejected a proposal to exclude noncitizens from apportionment. *See* H.R. Rep. No. 1787, at 1 (1940) (Ex. 55). And in 1980, a bill to exclude undocumented immigrants from the apportionment base failed after members of Congress once again expressed concern that the effort may be unconstitutional. *1980 Census: Counting Illegal Aliens: Hearing Before the S. Subcomm. on Energy, Nuclear Proliferation & Fed. Services of the Comm. on Gov'tal Affairs*, 96 Cong. 10 (1980).

Confirming this widely accepted understanding, the Executive Branch itself has previously taken the position that it would violate the Constitution to exclude undocumented immigrants from the decennial census. In *FAIR v. Klutznick*, the Department of Justice agreed that "[t]he literal and plain meaning of Article 1, Section 2 as adopted and as amended by the Fourteenth Amendment requires the whole number of persons in each state—without regard for the legal status of their residence—to be enumerated for the apportionment base." Defs.' Reply Mem. of Points & Opp'n to Pls.' Mot. for Summ. J. at 4, *FAIR v. Klutznick*, 486 F. Supp. 564 (D.D.C. Jan. 3, 1980) (No. 79-3269), 1980 WL 683642. The notion that there was a "legitimate distinction" between undocumented immigrants and other persons was, in the Department's view, "wholly erroneous."

12

*Id.* at 4-5. The "population base for purposes of apportionment has always included all persons, including aliens both lawfully and unlawfully within our borders." *FAIR*, 486 F. Supp. at 576. Later, when asked about the constitutionality of a legislative proposal to exclude undocumented immigrants from the decennial census count, the Department affirmed that "section two of the Fourteenth Amendment . . . and the original Apportionment and Census Clauses of Article I section two of the Constitution require that inhabitants of States who are illegal aliens be included in the census count." 135 Cong. Rec. S12234 (1989).

In light of this history and entrenched practice, the Apportionment Clause undisputedly compels the counting and inclusion of *all* persons living in the United States, regardless of their immigration status. This principle is, quite literally, foundational to American democracy as it was conceived by the Framers and more deeply ensconced in the Constitution by the drafters of the Fourteenth Amendment. The Memorandum sets its teeth against this constitutional command and trumpets a brazen decision, not to defend and protect the Constitution, but to defy it.

### 2.   The Statutory Framework Implements the Constitutional Mandate and Bars Any Presidential Discretion With Respect to the Apportionment Base.

Congress, by enacting 2 U.S.C. § 2a(a), has translated this longstanding understanding—that the Apportionment Clause directs the inclusion of immigrants in the apportionment base—into a Presidential duty. That section directs the President to transmit an apportionment statement "showing the whole number of persons in each State, excluding Indians not taxed." 2 U.S.C. § 2a(a). This language—identical to the Fourteenth Amendment's operative language amending the Apportionment Clause—should be interpreted identically. *See United States v. Simms*, 914 F.3d 229, 240 (4th Cir. 2019) (en banc) ("materially identically language" should be interpreted identically). Thus, just as the Apportionment Clause requires that the apportionment base include

immigrant residents, 2 U.S.C. § 2a(a) requires the President *personally* to include non-citizen residents—regardless of immigration status—in his apportionment statement to Congress.

Section 2a(a) admits no other construction given the principle that "Congress is presumed to enact legislation with knowledge of the law," *Fed. Fin. Co. v. Hall*, 108 F.3d 46, 50 (4th Cir. 1997), and thus "legislates in the light of constitutional limitations," *Jones v. United States*, 526 U.S. 227, 240 (1999) (quoting *Rust v. Sullivan*, 500 U.S. 173, 191 (1991)). Indeed, before enacting what is now 2 U.S.C. § 2a(a) as part of the Reapportionment Act of 1929, Congress expressly considered legislation "excluding aliens from enumeration for the purposes of apportionment," but was advised that "there is no constitutional authority" for doing so. 71 Cong. Rec. 1822 (May 23, 1929). Instead, Congress proceeded with statutory language mirroring the Apportionment Clause's broad inclusion of all "persons" without regard to immigration status.

Congress has imposed a parallel obligation on the Secretary of Commerce. Since 1954, the Secretary has been required to report the "tabulation of *total population* by States . . . *as required for the apportionment* of Representatives in Congress." 13 U.S.C. § 141(b) (emphasis added); *see* Pub. L. No. 83-740, 68 Stat. 1012, 1020 (1954) (enacting the predecessor statute to § 141(b), codified at 13 U.S.C. § 143, directing the Secretary to transmit a "tabulation of total population by States as required for the apportionment of Representatives"). "[T]otal population" here again encompasses all persons regardless of citizenship or immigration status. The word "total" means "whole; not divided; full; complete," *Black's Law Dictionary* (11th ed. 2019). Any division of the population into those with "a lawful immigration status" and those without, as the Memorandum contemplates, would necessarily render partial and incomplete any resulting population figures that exclude the latter category. And any statement from the Secretary that so separates would thus violate § 141(b)'s requirement that he transmit a tabulation of "*total* population by States."

Any other interpretation would contradict Congress's presumed knowledge of the law, *see Fed. Fin. Co.*, 108 F.3d at 50, a particularly implausible assumption here given the statute's attachment of the clause "as required for . . . apportionment" to "total population," 13 U.S.C. § 141(b). Read in context, this modifier can refer only to the requirements imposed by the Apportionment Clause and 2 U.S.C. § 2a(a)—including that apportionment be based on the "whole number of Persons" regardless of citizenship or immigration status.

Both 2 U.S.C. § 2a(a) and 13 U.S.C. § 141 "provide[] discernible limits," *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 801 F. Supp. 2d 383, 406 (D. Md. 2011), *aff'd* 698 F.3d 171 (4th Cir. 2012), on how apportionment must be conducted. As the Supreme Court explained, Congress "mandat[ed] a population count that will be used to apportion representatives" through the enactment of 2 U.S.C. § 2a and 13 U.S.C. § 141, which "impose[] 'a duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment.'" *New York II*, 139 S. Ct. at 2568-69 (quoting *Franklin*, 505 U.S. at 819-20 (Stevens, J., concurring in part and concurring in judgment)). The question is thus whether the actions directed by the Memorandum "run afoul of the Constitution" or "'independently violate[]'" the statutory limits Congress has imposed, rendering them *ultra vires. Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (quoting *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1332 (D.C. Cir. 1996)). The answer is yes: the Memorandum contradicts not only the Apportionment Clause and the Fourteenth Amendment, but also disregards the precise requirements that Congress has imposed on the President and the Secretary by statute.

### 3. The Memorandum's Legal and Policy Assertions Have No Merit.

The Memorandum's attempt to rationalize this unlawful arrogation of power lacks any foundation in law. The document makes no effort to address the plain language of the Constitution,

15

much less the consistent rejection of the restrictive meaning that Defendants espouse, by both the drafters of the Constitution and the Supreme Court. Instead, it claims that the President has "discretion" to determine that an entire class of "illegal aliens" should not be treated as "inhabitants" of a State. Memorandum § 1. But there is no reasonable basis to exclude an entire class of persons from the apportionment based on immigration status alone, which says little about whether they are "in [a] State" for purposes of the Apportionment Clause. Just as citizens and noncitizens are both *excluded* from the apportionment base if they are domiciled abroad, citizens and noncitizens alike are *included* if they live in the United States. In neither case is immigration status relevant to determining if someone is an "inhabitant" of the United States.

Defendants' reasoning also contradicts the plain meaning of the term "inhabitant." An "inhabitant" is simply "a person . . . that lives in a particular place." Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/inhabitant; *accord* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/inhabitant ("[O]ne that occupies a particular place regularly, routinely, or for a period of time."). In *Franklin*—the decision from which Defendants evidently cherry-picked the term "inhabitant"—the Supreme Court held that an "inhabitant" is any person whose "usual residence" is in the United States. 505 U.S. at 805. Thus, a noncitizen who "lives in a particular" state *is* an inhabitant of that state, no matter her immigration status.

The examples cited in the Memorandum further prove this point. While the Memorandum notes that some people who are temporarily visiting the United States for business or tourism may be excluded from the decennial census as non-inhabitants, it fails to acknowledge that such temporary visitors have avowedly *not* made the United States their "usual residence." *See* Memorandum § 1. Similarly, federal military and civil personnel who are not physically present in this country but are temporarily serving overseas have not relinquished the United States as their

"usual residence." *Id.*; *see Franklin*, 505 U.S. at 806 (federal personnel "temporarily stationed abroad" by the government "retained their ties to the States" and could be counted). The Memorandum's suggestion that undocumented immigrants—many of whom have lived in the United States for decades—are categorically disqualified from counting as "inhabitants" would gut that term of its ordinary meaning.[2]

Finally, the Memorandum incorrectly asserts that excluding undocumented immigrants from the apportionment base "is more consonant with the principles of representative democracy underpinning our system of Government." Memorandum § 2. In fact, as demonstrated above, the overwhelming evidence through over two centuries of practice establishes that the opposite is true. As the Framers well comprehended, "representatives serve all residents, not just those eligible or registered to vote," and "[n]onvoters have an important stake in many policy debates. . . and in receiving constituent services." *Evenwel*, 136 S. Ct. at 1132. Undocumented immigrants who reside in the United States are no different than citizens who are not eligible to vote or lawfully present non-citizens. They "contribute to our economy and civic life in countless ways." *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 64 (D.D.C. 2019) (citation omitted), *rev'd and remanded sub nom. Make the Rd. N.Y. v. Wolf*, 962 F.3d 612 (D.C. Cir. 2020). Unlike "Indians not taxed," who are explicitly excluded from the apportionment base, undocumented immigrants often "contribut[e] . . . tax money to the state fisc." *Plyler*, 457 U.S. at 228. Thus, contrary to what the

---

[2] The Residence Rule, which specifies the Bureau's criteria for "count[ing] everyone in the right place during the decennial census," is consistent with this approach. 83 Fed. Reg. at 5526. According to that Rule, immigrants and other "citizens of foreign countries living in the United States" must be "[c]ounted at the U.S. residence where they live and sleep most of the time." *Id.* at 5533. The Rule makes no mention of a resident's immigration status. The President's attempt to carve out all undocumented immigrants from the definition of "inhabitant" is clearly out of step with the constitutional text and administrative practice.

Memorandum suggests, excluding undocumented immigrants from the apportionment base would *undermine* the principle of representative democracy underpinning American government.

The plain text of the Constitution, Supreme Court precedent, and the Census Bureau's past practice each makes clear that the Memorandum violates the Apportionment Clause's requirement that apportionment be based on "the whole number of persons in each State" and the statutory provisions translating that requirement into duties imposed on Secretary of Commerce, *see* 13 U.S.C. § 141, and the President, *see* 2 U.S.C. § 2a. The Court should thus grant summary judgment in Plaintiffs' favor on Counts I, Count IV to the extent based on 13 U.S.C. § 141, and Count V to the extent based on 2 U.S.C. § 2a(a)'s "whole number of persons" requirement.

> **B.      The Memorandum Violates Constitutional and Statutory Requirements that Apportionment Be Based Only on the Decennial Census.**

Contrary to the Memorandum, the President does not have unfettered discretion to "make[] the final determination" of which population counts to use for apportionment. Memorandum § 1. He is "*required* to use the data from the decennial census." *U.S. House of Representatives v. U.S. Dep't of Commerce* ("*House v. Commerce*"), 11 F. Supp. 2d 76, 93 (D.D.C. 1998) (three-judge panel) (citing *Franklin*, 505 U.S. at 797), *aff'd*, 525 U.S. 316. Basing apportionment on a population count generated through some other procedure, as the Memorandum directs, violates the Enumeration Clause and is contrary to 2 U.S.C. § 2a(a). The Court should therefore additionally grant summary judgment in Plaintiffs' favor on Count III and Count V.

The Enumeration Clause requires that the "whole number of persons in each State" for purposes of apportionment shall be determined by an "actual Enumeration" of the population "in such Manner as [Congress] shall by Law direct." U.S. Const. art. I, § 2, cl. 3. Congress has in turn directed the Secretary to conduct this "decennial census of population" and provide to the President "[t]he tabulation of total population by States" obtained through that decennial census "as required

for the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(a), (b). The Constitution therefore requires that the population counts used to apportion congressional seats be determined by the "decennial census" undertaken pursuant to 13 U.S.C. § 141. This requirement is reinforced by the statutory mandate that the President report to Congress "the whole number of persons" that are "ascertained under . . . the decennial census" and "the number of Representatives to which each state is entitled." 2 U.S.C. § 2a(a).

The apportionment policy set forth in the Presidential Memo flouts these legal constraints and is thus unconstitutional and *ultra vires*. *See Mountain States*, 306 F.3d at 1136; *Ancient Coin Collectors*, 801 F. Supp. 2d at 406. The President seeks to base apportionment on the number of residents in each state who are either citizens or "in a lawful immigration status," Memorandum § 1—information that the ongoing decennial census is not gathering, or even seeking to gather. As set forth in the Residence Rule, which "determine[s] where people are counted during each decennial census," the 2020 decennial census is enumerating all individuals who "live and sleep most of the time" in the United States without regard for citizenship or immigration status. Residence Rule, 83 Fed. Reg. at 5526, 5533. Indeed, the Residence Rule expressly states that foreign citizens will be "[c]ounted at the U.S. residence where they live and sleep most of the time," and only foreign citizens "visiting the United States, such as on a vacation or business trip" will be excluded. *Id.* at 5533. In promulgating this rule, the agency expressly considered and rejected concerns about "including undocumented people in the population counts." *Id.* at 5530. The Census questionnaire implements the Bureau's final rule, asking households to identify the

number of people "who live and sleep here most of the time,"[3] whether or not they are "aliens who are not in a lawful immigration status." Memorandum § 1.

The Presidential Memo expressly confirms that its apportionment plan will rely on population counts generated *separately* from the decennial census. It directs the Secretary to provide population data enabling the exclusion of undocumented immigrants *in addition to* the population counts "tabulated according to the methodology set forth in [the Residence Rule]." Memorandum § 3. The government has subsequently confirmed that the alternative population counts sought by the Presidential Memo would not be generated by the ongoing decennial census: "The Census Bureau is conducting a complete enumeration of the total population and nothing in the [Memorandum] alters that counting process." Letter to Judge Furman 9, *New York v. Trump*, No. 1:20-cv-5770, (S.D.N.Y. Aug. 3, 2020), ECF No. 37.

## II.    Plaintiffs are Entitled to a Preliminary Injunction in the Alternative.

"A plaintiff seeking a preliminary injunction must establish that he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Even if the Court concludes that Plaintiffs are not entitled to partial summary judgment, Plaintiffs are nonetheless entitled to a preliminary injunction preventing Defendants from implementing, or taking action pursuant to, the Memorandum. All four requirements are readily established here.

---

[3] *See* U.S. Census Bureau, *2020 Census Informational Bilingual Questionnaire* (Mar. 7, 2020), https://www2.census.gov/programs-surveys/decennial/2020/technical-documentation/questionnaires-and-instructions/questionnaires/2020-informational-questionnaire.pdf.

### A.      Plaintiffs Are, at Minimum, Likely to Succeed on the Merits of Their Claims.

"[P]laintiffs seeking injunctions [must] make a 'clear showing' that they are likely to succeed at trial, [but] plaintiffs need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013). For the reasons explained in section I, *supra*, Plaintiffs are entitled to judgment as a matter of law on their claims that the Memorandum violates the Constitution as well as the statutory scheme governing the Census and apportionment. Plaintiffs' showing is thus far more conclusive than the likelihood of success needed to justify preliminary relief.

Plaintiffs are also likely to prevail on their other claims—in particular, their equal protection claim. Generally, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). A plaintiff need not, however, "prove that the challenged action rested *solely* on racially discriminatory purposes." *Id.* (emphasis added). It is enough "that a discriminatory purpose has been a motivating factor in the decision." *Id.* at 265-66. "[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose." *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204, 222 (4th Cir. 2016).

Because "[o]utright admissions of impermissible racial motivation are infrequent[,] . . . plaintiffs often must rely upon other evidence," including circumstantial evidence. *See Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). "In determining whether racially discriminatory intent existed," courts consider the *Arlington Heights* factors, which include: (1) the discriminatory "impact of the official action," (2) the "historical background," (3) the "specific sequence of events leading up to the challenged decision," (4) any departures from normal procedures or substance, and (5) the "legislative or administrative history," including any "contemporary statements" of policymakers. *Arlington Heights*, 429 U.S. at 266-68; *see also Abbott v. Perez*, 138 S. Ct. 2305,

2346 (2018) (Sotomayor, J., dissenting); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 603 (4th Cir. 2016). Plaintiffs are likely to succeed on their equal protection claim under these factors.

*First*, the Memorandum undoubtedly has a discriminatory impact. If Defendants are permitted to carry out the policy set forth in the Memorandum, several states will lose seats in the House of Representatives. As Dr. Gilgenbach calculates, California and Texas both have proportions of Hispanic residents that are more than twice the national average, and each is likely to lose a congressional seat if the Memorandum is implemented. Gilgenbach Decl. ¶¶ 33 & tbl. 10. By contrast, the states that are likely to gain seats—Ohio and Minnesota, and possibly Alabama— have a lower percentage of non-Hispanic whites and higher percentages of non-whites, Hispanics, and immigrants than the national averages. *See id.*[4] Thus, Defendants' actions, though framed as an effort targeting undocumented immigrants, has a discriminatory impact on the basis of race. This discriminatory impact would not be limited to apportionment in Congress. Because each state is entitled to an elector in the Electoral College for each of its congressional seats, U.S. Const. art. II, § 1, cl. 2, the Memorandum would deprive citizens in states with a higher percentage of non- white Hispanics of political power in Presidential elections for the next decade.

Moreover, as Defendants have made clear, they intend for states to use the administrative records and methodology developed for the Memorandum to exclude undocumented immigrants in subsequent rounds of redistricting for statewide elections. *See* 2019 Executive Order § 1 (admitting citizenship data could be used in intrastate redistricting). "[A]s a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis." *Reynolds v. Sims*, 377 U.S. 533, 568

---

[4] U.S. Census Bureau, *State Population by Characteristics: 2010-2019*, https://www.census.gov/ data/tables/time-series/demo/popest/2010s-state-detail.html (Table SC-EST2019-ALLDATA5).

(1964). States therefore must "[e]nsure that each person's vote counts as much, insofar as it is practicable, as any other person's" and protect each person's vote "against dilution or debasement." *Hadley v. Junior Coll. Dist. of Metro. Kan. City*, 397 U.S. 50, 52 (1970). The Memorandum, by design, would contravene this constitutional command by allowing states to erase district lines and pack non-white immigrant communities into fewer districts, thus diluting their political power. And Defendants' announcement that they plan to exclude undocumented immigrants will suppress the census response in Hispanic communities. *See, e.g.*, Barreto Decl. ¶ 70; Gilfillan Decl. ¶¶ 8-11. Fewer federal resources will thus be allocated to those communities than would be allocated absent Defendants' unlawful policy. *See* section II.B.2, *infra*.

*Second*, the "historical background" of the Memorandum and the "specific sequence of events leading up to" it further support a finding of discriminatory intent. From the dawn of the Trump Administration, Defendants have worked to weaken the political power of non-white, Hispanic communities. The President's allies at the Census Bureau and DOJ conspired to add a citizenship question to the 2020 Census. *Kravitz II*, 382 F. Supp. 3d at 397-98.[5] As the Hofeller files revealed, this effort had a singular goal: advantaging "Republicans and non-Hispanic whites." Pls.' Mot. for Order to Show Cause Ex. D at 9, *New York v. Dep't of Commerce*, No. 18-CV-2921 (S.D.N.Y. May 31, 2019), ECF No. 595-1. Defendants laundered their discriminatory plan through DOJ by concocting a pretextual explanation—that including a citizenship question on the 2020 Census questionnaire was necessary to enforce the Voting Rights Act. *New York I*, 351 F. Supp. 3d at 556-57. It is now obvious that explanation was false from the start.

---

[5] *See also* Bryan Lowry, *That Citizenship Question on the 2020 Census? Kobach Says He Pitched It to Trump*, Kan. City Star (Mar. 27, 2018, 2:01 p.m.), https://www.kansascity.com/news/politics-government/article207007581.html.

Once their attempt to add the citizenship question was rejected by the Supreme Court, Defendants abandoned the pretext that they intended to *protect* voting rights and crafted an alternative means of accomplishing their unlawful goal of *suppressing* voting rights: excluding undocumented immigrants from the apportionment base by presidential fiat. Neither the 2019 Executive Order nor the Memorandum makes any reference to enforcing the VRA. Rather, the 2019 Executive Order openly admits that the data could be used by states to exclude undocumented immigrants during the redistricting process, 2019 Executive Order § 1, thus weakening the political power of non-white immigrant communities within the states. This "departure[] from the normal procedural sequence" is "evidence that improper purposes . . . play[ed] a role" in the events leading to the Memorandum. *Arlington Heights*, 429 U.S. at 267. It is reasonable to "infer from the falsity of the [original] explanation that the" Defendants were "dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *accord Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373, 1382 (10th Cir. 1994) ("[T]he School District's change of position regarding the reason for Cole's renewal does tend to show pretext.").

Because the Memorandum would dilute the political power of non-white Hispanic communities and deprive them of federal resources, and in light of the evidence of discriminatory intent, Plaintiffs are likely to succeed on their equal protection claim.[6]

**B.    Plaintiffs Are Likely to Suffer Irreparable Harm Absent an Injunction.**

Plaintiffs also establish the second *Winter* factor, "irreparable injury" that "is likely in the absence of an injunction." 555 U.S. at 22. To be sufficiently "likely," the threatened irreparable harm must be "actual and imminent" and "neither remote nor speculative." *Scotts Co. v. United*

---

[6] This motion does not address Plaintiffs' remaining claims regarding the Census Bureau's implementation of the Memorandum, but Plaintiffs are equally likely to prevail on those claims.

*Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002). This requirement is "akin conceptually" to Article III's requirement of an injury-in-fact that is "actual and imminent, not conjectural or hypothetical." *Williams v. N.Y. State Office of Mental Health*, 2011 WL 2708378, at *3 (E.D.N.Y. July 11, 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). At bottom, however, Plaintiffs need only show a "*threat* of irreparable harm" and not a certainty. *Morgan Keegan & Co. v. Louise Silverman Trust*, 2012 WL 113400, at *2 (D. Md. Jan. 12, 2012) (emphasis added). That harm also "need not have been inflicted when application is made." *Twyman v. Rockville Hous. Auth.*, 99 F.R.D. 314, 321 (D. Md. 1983); *see also Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (no requirement "that irreparable harm already ha[s] occurred").

The threatened injury must also be irreparable in that it cannot "be remedied by money damages at the time of judgment." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). "[A] prospective violation of a constitutional right constitutes irreparable injury," *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) (citing *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987)), but harms short of constitutional deprivations are irreparable, too, if monetary "damages are difficult to ascertain or are inadequate," *Coreas v. Bounds*, 2020 WL 1663133, at *13 (D. Md. Apr. 3, 2020) (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994)). That is, "irreparability of harm includes the impossibility of ascertaining with any accuracy the extent of the loss." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985) (citation omitted).

Plaintiffs are likely to suffer at least three irreparable harms if the Memorandum is not enjoined. First, several of the states in which the Individual Plaintiffs reside are likely to be denied the representation in Congress to which they are entitled, thereby diluting the votes of their residents, including several of the Individual Plaintiffs. Second, the Memorandum deters Latino,

immigrant, and non-citizen participation in the Census on an ongoing basis. That amplified undercount threatens to irreparably harm the Individual Plaintiffs by further diluting their votes and causing an under-allocation of federal funding to the areas in which they reside. Finally, the Memorandum interferes with the Organizational Plaintiffs' interests in encouraging participation in the 2020 Census and frustrates their ability to carry out their responsibilities in furthering their goals. As a result, the Organizational Plaintiffs have expended, and will continue to expend, limited resources to combat the Memorandum's chilling effect on Census participation.

1. **The Individual Plaintiffs Will Be Irreparably Harmed by the Loss of Representation to Which They are Constitutionally Entitled.**

The exclusion of undocumented immigrants from the apportionment base, as directed by the Memorandum, will cause certain states to receive fewer congressional seats than the number to which they are entitled under the Constitution. The loss of those seats deprives the voters in those states—including a number of the Individual Plaintiffs—of the representation to which they are entitled and unconstitutionally dilutes their votes. The curtailment of the Individual Plaintiffs' representation and the dilution of their votes works an irreparable harm meriting an injunction.

Two of the states in which the Individual Plaintiffs reside—California and Texas—are virtually certain to lose congressional seats if the Memorandum is implemented. A comprehensive statistical analysis by Dr. Ruth Gilgenbach shows that under a wide range of demographic assumptions, California and Texas—where Plaintiffs Dodani, Kang, Lira, Ulloa, and White reside and are registered to vote—are "highly likely" to lose one seat each. Gilgenbach Decl. ¶¶ 33, 38-39. This is no surprise. The Memorandum contemplates precisely such an effect, singling out California as a state that *should* lose representation based on the exclusion of undocumented

immigrants that the Memorandum directs. Memorandum § 2.[7] Beyond California and Texas, Dr. Gilgenbach also finds that New Jersey—where Plaintiff Cohen resides and votes—is at substantial risk of losing a seat if the Memorandum is implemented. *Id.*

When a state "anticipate[s] losing a seat in Congress," that "diminishment of political representation" is an injury suffered by both the State, *New York II*, 139 S. Ct. at 2565, and its citizens, *see New York I*, 351 F. Supp. 3d at 607-08. For the state's citizens, "[t]he loss of a Representative means that [their] 'votes will be diluted,' and faced with [such a loss], the harm of vote dilution 'is concrete and actual or imminent, not conjectural or hypothetical.'" *Kravitz I*, 366 F. Supp. 3d at 737 (quoting *Commerce v. House*, 525 U.S. at 331-32). Such vote dilution is a harm of constitutional magnitude. *See, e.g.*, *Reynolds*, 377 U.S. at 560-63 (vote dilution violates equal protection); *Wesberry*, 376 U.S. at 7-8 (congressional vote dilution violates Article I of the Constitution); *see also Franklin*, 505 U.S. at 804 (noting "the constitutional goal of equal representation"). "[T]he deprivation of [plaintiffs'] right to a fair apportionment" leading to loss of representation, and the attendant vote dilution caused by that diminished representation, is an irreparable harm justifying an injunction. *Carey v. Klutznick*, 637 F.2d 834, 836 (2d Cir. 1980).

The fact that apportionment has not yet occurred does not alter the analysis: "[i]f judicial review must be deferred until after [the seating of a new Congress after reapportionment], the possibility of irreparable harm . . . is likely, if not certain." *House v. Commerce*, 11 F. Supp. 2d at 88. Here, the Individual Plaintiffs have "a plain, direct and adequate interest in maintaining the effectiveness of their votes." *Commerce v. House*, 525 U.S. 316, 331-32 (1999) (quoting *Baker v. Carr*, 369 U.S. 186, 208 (1962)). A state's "*expected* loss of a Representative to the United States

---

[7] The Memorandum does not identify the "one State" "home to more than 2.2 million illegal aliens, constituting more than 6 percent of the State's entire population," but that state is California.

Congress" is enough to render "the threat of vote dilution through [an illegal apportionment method] . . . concrete and actual or imminent, not conjectural or hypothetical." *Id.* (citation omitted). That threatened injury justifies an injunction here.

           **2.**      **The Individual Plaintiffs Will Be Irreparably Harmed by a Magnified Undercount that Further Dilutes Their Votes and Reduces Federal Funding to Their Areas.**

Even before the apportionment itself, the Memorandum—and its message that undocumented non-citizens simply do not count for the Census's one constitutional purpose, apportionment—deters participation in the 2020 Census on an ongoing basis. The Memorandum's deterrent effect is especially pronounced among Latinos, immigrants, and undocumented immigrants, and likely reduces the likelihood they will complete the Census, either through self-response or through the Bureau's non-response follow-up efforts. That suppressed response rate translates directly into a reduced count of those communities, both numerically and relative to other communities on whom the Memorandum has a weaker deterrent effect.

As Dr. Matthew Barreto explains, the Memorandum is likely to cause immigrants to "believe their participation is either no longer safe, or not required," which results in "a chilling effect and incentivize[s] households with undocumented immigrants to provide no additional information to the Federal Government that they feel would implicate their immigration status." Barreto Decl. ¶¶ 24, 31. Given the wide dissemination of the Memorandum, including across Spanish-language media that is often relied on by Latinos and Latino non-citizens, *e.g., id.* ¶ 32, "the [Memorandum] increases the likelihood that Latinos, immigrants, and noncitizens are less likely to self-respond to the 2020 census" and "nonresponding individuals are also unlikely to respond after household visits by census enumerators because of fear of government interaction." *Id.* ¶ 70. Similarly, former Census Director John H. Thompson testified to Congress that the Memorandum "has a high potential to reduce the likelihood of response for the hard-to-count

populations including non-citizens and immigrants." *Counting Every Person*: *Hearing on Presidential Memorandum Before the House Oversight Committee*, 116th Cong. (July 29, 2020) (statement of John H. Thompson), https://docs.house.gov/meetings/GO/GO00/20200729/110948/ HHRG-116-GO00-Wstate-ThompsonJ-20200729.pdf. The Memorandum "will increase the fear of many in the hard to count community that their data will not be safe. That is, there will be serious beliefs that their information will be given to immigration enforcement. The end result will most likely be increased nonparticipation and increased undercounts of these populations." *Id.*

Thus, "the predictable effect of Government action on the decisions of third parties" here, *New York II*, 139 S. Ct. at 2566, is to reduce Census participation among Latinos, immigrants, and undocumented immigrants. Consequently, those states and localities with relatively higher percentages of these demographic groups will suffer a disproportionate undercount. *See Kravitz I*, 366. F. Supp. 3d at 717-22. This further differential undercount harms the states and localities with higher proportions of those groups. The localities where the Individual Plaintiffs reside are precisely such areas. *See* Gilgenbach Decl. ¶¶ 43-49 & tbls. 10-11.

Unless and until enjoined, the Memorandum and the differential undercount it predictably causes will (i) dilute these Individual Plaintiffs' votes through the process of intrastate redistricting and (ii) reduce the federal funding their states and localities receive under population-based allocation formulas.

*First*, separate and apart from any effect on apportionment, a disproportionate undercount would cause Plaintiffs' localities to receive representation reduced from the level they would receive absent the marginal differential undercount caused by the Memorandum—an imminent harm that inexorably follows from a particularly pronounced undercount in Plaintiffs' local areas. "Intrastate vote dilution plainly qualifies as an injury in fact." *New York I*, 351 F. Supp. 3d at 608

(citing *Commerce v. House*, 525 U.S. at 332-33; and *Carey*, 637 F.2d at 838). "[R]esidents of counties that 'were substantially likely to lose population' (i.e., be undercounted) under a proposed Census procedure" established an injury that was sufficiently actual and imminent—and not conjectural and hypothetical—because voters in those counties were "substantially likely . . . to suffer vote dilution as a result." *Kravitz I*, 366 F. Supp. 3d at 737 (citing *Commerce v. House*, 525 U.S. at 332-34); *see also Glavin*, 19 F. Supp. 2d at 549.

Indeed, many of the states in which the Individual Plaintiffs reside "expressly use Decennial Census counts to draw equal-population congressional and state legislative districts," including California, Florida, Nevada, and Texas. *Kravitz I*, 366 F. Supp. 3d at 723. Because of this reliance on Census data, the marginal differential undercount caused by the Memorandum— particularly pronounced in the areas in which Plaintiffs reside—is substantially likely to dilute the votes of each of the Individual Plaintiffs. Thus, just as with the direct loss of the Individual Plaintiffs' congressional representation resulting from the Memorandum's effect on interstate apportionment, this dilution of Individual Plaintiffs' voting power in intra-state redistricting inflicts an irreparable harm of constitutional magnitude. *See supra* section II.B.1.

*Second*, Plaintiffs' states and local areas will also "lose out on federal funds that are distributed on the basis of . . . population." *New York II*, 139 S. Ct. at 2565. That reduction in funding is a harm traceable to the further differential undercount caused by the Memorandum. *See id.*; *see also Carey*, 637 F.2d at 838; *Glavin*, 19 F. Supp. 2d at 550. That reduced funding occurs by operation of law through programs such as "'state-share' programs, which rely in whole or part on the state's share of the total U.S. population." *New York I*, 351 F. Supp. 3d at 596. For example, the Social Services Block Grant program directs the allocation of funds to each state "as the population of that State bears to the population of all the States." 42 U.S.C. § 1397b(b). While this

allocation is based on population data "as determined by the Secretary [of Health and Human Services] (on the basis of the most recent data available from the Department of Commerce)," *id.*, the population figures as reported by the Census inevitably factor into these subsequent determinations of population, *cf.* 13 U.S.C. § 183(a) (directing the use of "data most recently produced and published under this title," including the decennial census, "for the purpose of administering any law of the United States in which population . . . [is] used to determine the amount of benefit received by State, county or local units of . . . government"). Likewise, a disproportionate undercount in a given state is likely to cause a reduction in Medicaid funding to that State. *Kravitz I*, 366 F. Supp. 3d. at 728-29.

An undercount also affects intrastate allocation of funds based on population. For example, the Surface Transportation Block Grant ("STBG") program directs states receiving such grants to "allocat[e] apportioned funds to areas based on population." 23 U.S.C. § 133(d). In particular, each state receiving funds is obligated to allocate between at least 51 percent of the STBG funds it receives "in proportion to their relative shares of the population of the State" across three categories of areas: (1) "urbanized areas" with "population of over 200,000," (2) "areas . . . other than urban areas with a population greater than 5,000", and (3) "in other areas of the State." 23 U.S.C. § 133(d)(1)(A), (6). Given these intra-state allocations by population, "[a] differential undercount of Hispanics and/or noncitizens of any magnitude will cause" urbanized areas with "higher percentages of Hispanic and noncitizen residents relative to the rest of the state" "to lose . . . STBG[] suballocation funding." *Kravitz I*, 366 F. Supp. 3d at 738.

The harm of reduced funding, while monetary, is nonetheless irreparable given "the impossibility of ascertaining with any accuracy the extent of the loss" after the Census has been completed. *Merrill Lynch*, 756 F.2d at 1055 (citation omitted). Proper allocations of funding would

require a determination of what the populations of states and local areas would have been absent the Memorandum's deterrent effects, a task that commonly-used statistical imputations are ill-equipped to complete. *See* Barreto Decl. ¶¶ 80-86; *cf. House v. Commerce*, 11 F. Supp. 2d at 88 (noting irreparable harm resulting from an invalid census given the potential need for "the entire enumeration to be re-conducted"). Determining damages would only be further complicated by the sheer number of programs that "use[] census-derived data" to distribute funding: "at least 320," many with their own idiosyncratic formulas. *Kravitz I*, 366 F. Supp. 3d at 726; *New York I*, 351 F. Supp. 3d at 596. This "makes any calculation of . . . damages difficult to ascertain and, therefore, supports a finding" of irreparable harm. *Multi-Channel TV*, 22 F.3d at 552 (citation omitted).

### 3. The Organizational Plaintiffs Are Harmed by the Memorandum's Interference with and Impediment of Their Organizational Activities.

An organization suffers "actual and imminent" injury where a challenged policy "has impeded, and will continue to impede, the organization's ability to carry out [its] responsibilit[ies]" and "will force [organization] to divert money from its other current activities to advance its established organizational interests." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110-11 (2d Cir. 2017); *see also Kravitz I*, 366 F. Supp. 3d at 741-42. The Memorandum inflicts both such harms on the Organizational Plaintiffs, the Arizona Center for Empowerment (ACE) and the Florida Immigrant Coalition (FLIC).

*First*, it directly interferes with the Organizational Plaintiffs' ability to effectuate their goals of encouraging participation in the 2020 Census, particularly within Latino, immigrant, and undocumented communities. The Organizational Plaintiffs have, as one of their goals, encouraging participation in the 2020 Census in those communities. Gilfillan Decl. ¶ 7; Rodriguez Decl. ¶ 7. The Organizational Plaintiffs have undertaken extensive efforts to advance this goal, such as conducting publicity and community outreach efforts to inform members of their communities of

the importance of completing the Census—regardless of the immigration status of the respondent and the members of her household. Gilfillan Decl. ¶¶ 7, 13-14; Rodriguez Decl. ¶¶ 7, 9-10.

The Memorandum impedes the ability of those organizations to encourage participation in the 2020 Census. As Dr. Barreto explains, the Memorandum "reverses recent progress that has been made by community-based organizations following the June 2019 Supreme Court ruling" in *New York II*, 139 S. Ct. 2551, which had allowed organizations like the Organizational Plaintiffs to "emphasize the benefits of participating in the census . . . without any fears about someone's immigration status being reported." Barreto Decl. ¶ 30. By rekindling would-be respondents' fears that "the federal administration will use whatever information they provide in the 2020 Census to target" undocumented noncitizens, *id.* ¶ 32, the Memorandum undercuts these methods.

The phenomenon that Dr. Barreto describes is not theoretical; the Organizational Plaintiffs have already witnessed—and been hampered by—the Memorandum's effects on their efforts to encourage Census participation. As the Development Director of ACE explains, the Memorandum has already "created confusion in the broader Hispanic, Latino, and immigrant communities" regarding the Census and "elevated fear in responding" to it. Gilfillan Decl. ¶¶ 10-11. Similarly, as FLIC's Executive Director explains, "it has to be mentioned very explicitly every single time that census information is not shared with immigration enforcement agencies," and the Memorandum amplifies these concerns. Rodriguez Decl. ¶ 9. By "creat[ing] the impression that undocumented residents do not need to fill out the 2020 Census," and sowing confusion about permissible "use[s] of census data," the Memorandum has "undermined ACE's messaging to the community regarding the Census." Gilfillan Dec. ¶¶ 11, 14; *see also* Rodriguez Decl. ¶ 10 (describing similar undermining of FLIC's messaging). The Organizational Plaintiffs have been,

and will continue to be, harmed by the Memorandum's interference with their goals of encouraging participation in the 2020 Census. *E.g.*, *Kravitz I*, 366 F. Supp. 3d at 742.

To overcome these hurdles built by the Memorandum, the Organizational Plaintiffs have devoted and diverted additional resources into their efforts to promote participation. Simply stated, the Memorandum "has forced ACE to spend additional resources, including time and money, to encourage people to respond to the 2020 Census" and "reassur[e] individuals about the confidentiality" of their responses. Gilfillan Decl. ¶¶ 12-13; *see also id.* ¶ 16 (noting "an increase in staff time and resources dedicated to [ACE's] Get Counted! Census efforts"). These diversions, too, are a cognizable harm. *E.g.*, *Kravitz I*, 366 F. Supp. 3d at 742.

These harms are irreparable, as monetary damages at final judgment cannot compensate for the damage to the Organizational Plaintiffs' interests in increasing participation in the 2020 Census. Only a limited amount of time remains before Defendants compete their enumeration and apportionment activities. Indeed, the Census Bureau has announced that field operations to enumerate households that have not self-responded to Census will end on September 30—instead of October 31 as previously contemplated. In light of this looming deadline for census participation, the "precious, productive time irretrievably lost" by the Organizational Plaintiffs amounts to irreparable harm. *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011). Once the window to participate in the 2020 Census has closed—an impending date less than two months away—even the most generous funding could not help the Organizational Plaintiffs advance their interests in increasing participation. *Cf. League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("[W]hen a plaintiff loses an opportunity to register a voter, the opportunity is gone forever.").

### C.      The Balance of the Equities and the Public Interest Support an Injunction.

Assessment of "the harm to the opposing party and weighing the public interest . . . merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Given the Memorandum's flagrant disregard for myriad constitutional and statutory requirements, these factors weigh heavily in favor of an injunction.

"[T]he public interest . . . requires obedience to the Constitution and to the requirement that Congress be fairly apportioned, based on accurate census figures." *Carey*, 637 F.2d at 839. It is thus served by enjoining implementation of the Memorandum, which disregards settled constitutional understanding and seeks to malapportion Congress based on erroneous population counts. By contrast, the government is "in no way harmed by issuance of a preliminary injunction" where, as here, the challenged actions are "likely to be found unconstitutional." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013).

These merged factors likewise support an injunction where, as here, the government's actions are "contrary to . . . statute and contravene[] clear congressional intent." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 855 (9th Cir. 2020). Put simply, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted). By contrast, there is "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," *id.* at 12, here the requirements of the Census Act and 2 U.S.C. § 2a. An injunction serves the public interest by "[e]nsuring that statutes enacted by [the public's] representatives are not imperiled by [the] executive fiat" that is the Memorandum. *E. Bay Sanctuary*, 964 F.3d at 855.

### CONCLUSION

Plaintiffs' motion for partial summary judgment should be granted. Alternatively, the Court should preliminary enjoin Defendants from implementing the Memorandum.

Dated: August 14, 2020

Respectfully submitted,

/s/
_____
Daniel T. Grant (Bar No. 19659)
Shankar Duraiswamy*
Carlton E. Forbes*
Jeffrey Cao*
Morgan E. Saunders*
Patricio G. Martínez-Llompart*
COVINGTON & BURLING LLP
One City Center
850 10th Street, NW
Washington, D.C. 20001
Tel: (202) 662-6000
Fax: (202) 662-6302
dgrant@cov.com
sduraiswamy@cov.com
cforbes@cov.com
jcao@cov.com
msaunders@cov.com
pmartinezllompart@cov.com

P. Benjamin Duke*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Tel: (212) 841-1000
Fax: (212) 841-1010
pbduke@cov.com

Morgan E. Lewis**
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Tel: (415) 591-6000
melewis@cov.com

*Attorneys for Plaintiffs*

\*        Admitted *pro hac vice*
\*\*      *Pro hac vice* application forthcoming

36