**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

NATALIA USECHE, *et al.*,          *

    Plaintiffs,              *

  v.                      *    No. 8:20-cv-02225-PX-PAH-ELH

DONALD J. TRUMP, *et al.*,         *

    Defendants.           *
                          ***

## <u>MEMORANDUM OPINION</u>

PER CURIAM.

Since the first census in 1790, every census and apportionment has accounted for the total persons in each state, without respect to immigration status. And until July 2020, no branch of the federal government ever had taken the position that non-citizen residents of the United States could lawfully be excluded, based on their immigration status, from the apportionment base.

The Presidential Memorandum before us, issued on July 21, 2020, upends that 230-year history. The Memorandum declares that it now "is the policy of the United States to exclude" undocumented immigrants "from the apportionment base . . . to the maximum extent feasible." Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census, 85 Fed. Reg. 44,679, 44,680 (July 23, 2020). To effectuate that policy, the Memorandum directs the Secretary of Commerce to provide the President with two sets of numbers: the customary count of all residents of each state, according to the census; and a new and second count from which undocumented immigrants have been subtracted, to be

used for the apportionment of congressional seats. And even though the Memorandum leaves to the Secretary how best to calculate the "maximum" number of undocumented immigrants in each state, it makes clear the purpose and expected result of this exercise. Some states with large immigrant populations will lose congressional seats – the Memorandum goes so far as to highlight California as one – and other states will gain them.

We are the third three-judge district court to address this Memorandum, and we substantially agree with our colleagues. Like the court in *City of San Jose v. Trump*, No. 20-CV-05167, 2020 WL 6253433 (N.D. Cal. Oct. 22, 2020), we conclude that the claims before us are justiciable given the substantial risk that states in which several plaintiffs reside will lose congressional representation under the Memorandum. Similarly, as in *City of San Jose* and *New York v. Trump*, No. 20-CV-5770, 2020 WL 5422959 (S.D.N.Y. Sept. 10, 2020), we find that the Presidential Memorandum violates the statutes governing the census and apportionment in two respects: by wholly excluding undocumented immigrants from the total population count used to apportion congressional seats; and by requiring the Secretary of Commerce to provide the President with data collected outside the decennial census for use in apportionment. We therefore enjoin all defendants, except for the President himself, from providing the President with information regarding the number of undocumented immigrants in each state for purposes of reapportionment.

## I.

We begin with a brief review of the relevant constitutional and statutory provisions, the Presidential Memorandum at the heart of this case, and the plaintiffs' challenge to that Memorandum.

## A.

The Constitution establishes the principle that congressional apportionment must be based on the "whole number" of persons in each state, as determined by the decennial census. Article I of the Constitution provides that an "actual Enumeration" of the population shall be conducted every ten years "in such Manner as [Congress] shall by Law direct," so that congressional representatives may be "apportioned among the several States." U.S. Const. art. I, § 2, cl. 3. The Fourteenth Amendment next requires that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." *Id.* amend. XIV, § 2. The number of Representatives apportioned to each state also determines that state's share of electors in the Electoral College. *See id.* art. II, § 1, cl. 2.

Congress, pursuant to its authority to direct the "Manner" of the census, has enshrined these principles into law. The Census Act directs the Secretary of Commerce (the "Secretary") to "take a decennial census of population as of the first day of April." 13 U.S.C. § 141(a). Section 141(b) of the Act then requires that the Secretary report to the President within nine months of the census date "[t]he tabulation of total population by States" as ascertained under the census and "as required for the apportionment of Representatives in Congress among the several States." *Id.* § 141(b). Therefore, in his Section 141(b) report, the Secretary must provide one number to the President – the tabulation of the whole number of persons in each state obtained from the decennial census. *Id.* The statute provides for no other number to be transmitted.

3

Once the President receives that number, he must "transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, . . . and the number of Representatives to which each State would be entitled."  2 U.S.C. § 2a(a).  This number is used for reapportionment and must be "ascertained under the . . . census of the population."  *Id.*  After the President has transmitted the number, the Clerk of the House of Representatives sends to the executive of each state the number of representatives to which his or her state is entitled.  *Id.* § 2a(b).

The Census Bureau, under the authority delegated to it by Congress, has also established final rules for the 2020 Census, including the rule for how and where individuals will be enumerated.  *See* Final 2020 Census Residence Criteria and Residence Situations, 83 Fed. Reg. 5525 (Feb. 8, 2018) (the "Residence Rule").  Under the Residence Rule, the "specific location" at which a person is counted for purposes of the census is determined by the "concept of 'usual residence,' which is defined by the Census Bureau as the place where a person lives and sleeps most of the time."  *Id.* at 5526.  "This concept of 'usual residence' is grounded in the law providing for the first census, the Act of March 1, 1790, expressly specifying that persons be enumerated at their 'usual place of abode.'"  *Id.* (citation omitted).

The Residence Rule applies to citizens and non-citizens alike, regardless of their legal status.  "Citizens of foreign countries living in the United States" are "[c]ounted at the U.S. residence where they live and sleep most of the time."  *Id.* at 5533.  Although one commenter "expressed concern" during the notice and comment period "about the impact of including undocumented people in the population counts for redistricting because these

4

people cannot vote," the Census Bureau explained that it would "retain the proposed residence situation guidance for foreign citizens in the United States."  *Id.* at 5530.  That means undocumented persons must be counted in the 2020 Census under the Residence Rule "if, at the time of the census, they are living and sleeping most of the time at a residence in the United States."  *Id.*

### B.

The Residence Rule became final in February 2018, and the Census Bureau began conducting the 2020 decennial census on January 21, 2020.  *See Important Dates*, U.S. Census Bureau, https://2020census.gov/en/important-dates.html (last visited Nov. 3, 2020).  Exactly six months into the census count, on July 21, 2020, the President issued a Presidential Memorandum titled "Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census."  85 Fed. Reg. 44,679 (July 23, 2020) (the "Presidential Memorandum" or "Memorandum").  The Presidential Memorandum declares that "it is the policy of the United States to exclude from the apportionment base aliens who are not in a lawful immigration status . . . to the maximum extent feasible and consistent with the discretion delegated to the executive branch."  *Id.* at 44,680.  Under the Memorandum, the Secretary must first "take all appropriate action" in compiling his Section 141(b) report "to provide information permitting the President, to the extent practicable, to exercise the President's discretion to carry out the policy set forth in [the Memorandum]."  *Id.*  Second, "[t]he Secretary shall also include in that report information tabulated according to the methodology set forth in" the Residence Rule.  *Id.*

As the government explains, this language "direct[s] the Secretary to report two sets

of numbers" to the President.   ECF No. 36 ("Defs.' Opp'n"), at 38.   One is an "enumeration" of the population of each state tabulated according to the Residence Rule. *Id.* at 4.   The other consists of "'information permitting the President, to the extent practicable,' to carry out the stated policy, *i.e.*, an apportionment excluding illegal aliens," *id.* (citation omitted) – or, in short, a population tabulation from which undocumented immigrants, "to the maximum extent feasible," have been excluded.   *See* Presidential Memorandum, 85 Fed. Reg. at 44,680.

## C.

On July 31, 2020, 11 individuals and two nongovernmental organizations brought this case against the government, naming as defendants President Donald J. Trump, Secretary of Commerce Wilbur L. Ross, Jr., Census Bureau Director Steven Dillingham, the Department of Commerce, and the Census Bureau.[1]   In their amended complaint, the plaintiffs contend that the Presidential Memorandum is unlawful because it violates (1) the Fourteenth Amendment's requirement that apportionment be based on the whole number of persons in each state; (2) Article I's requirement that the apportionment be based on an "actual Enumeration" taken every ten years in the manner Congress directs; (3) the relevant census- and apportionment-related statutes – 13 U.S.C. §§ 141, 195 and 2 U.S.C. § 2a; and (4) 5 U.S.C. § 706(2) of the Administrative Procedure Act. The amended complaint also

---

[1] This case initially was assigned to Judge Xinis.   On August 17, 2020, at the plaintiffs' request and without objection from the government, Judge Xinis sought appointment of a three-judge district court pursuant to 28 U.S.C. § 2284.   *See* ECF Nos. 17, 21.   On August 26, 2020, the Honorable Roger L. Gregory, Chief Judge of the Fourth Circuit, added Judges Harris and Hollander to form this three-judge court.   *See* ECF No. 29.

alleges that the Memorandum discriminates against Hispanic communities and immigrant communities of color in violation of the Fifth Amendment's Due Process clause.  As relief, plaintiffs ask this Court to declare the Presidential Memorandum unlawful, to issue writs of mandamus requiring the Secretary and the President to comply with federal law, and to enjoin the defendants from excluding undocumented immigrants from the apportionment base.

Although the amended complaint is far-reaching, we consider today a more limited motion for partial summary judgment.  Summary judgment is warranted when the court, viewing the evidence in the light most favorable to the non-moving party, finds "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment."  *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).

The plaintiffs maintain that they are entitled to summary judgment as to two claims. First, they argue that by excluding undocumented immigrants from the apportionment base, the Presidential Memorandum violates, as a matter of law, the requirement set out in the Fourteenth Amendment, 13 U.S.C. § 141(b), and 2 U.S.C. § 2a that the "whole number of persons in each State" or "total population by States" be used for apportionment.  *See* ECF

No. 19-1 ("Pls.' Mem."), at 7–18.  Second, they argue that the Presidential Memorandum also violates Article I, 13 U.S.C. § 141(b), and 2 U.S.C. § 2a(a) by requiring the use of non-census data in the Secretary's Section 141(b) report and for apportionment.  *Id.* at 18–20.[2]

In support of standing, the plaintiffs argue that the Presidential Memorandum creates a substantial risk that they will suffer an apportionment harm because certain states in which they reside will lose congressional seats.   ECF No. 39 ("Pls.' Reply"), at 5–6.  According to the plaintiffs, this harm is to be expected; the Presidential  Memorandum is "expressly *intended* to reduce representation in states with large numbers of undocumented immigrants," singling out California – where some of the plaintiffs live – as a state that should lose congressional seats under the new policy.  *Id.*  The plaintiffs buttress their claim with the uncontested expert report of economist Dr. Ruth Gilgenbach, showing that "under an exceptionally broad range of assumptions and accounting for significant statistical uncertainty," California and also Texas – where other plaintiffs live – each are "virtually

---

[2] Alternatively, the plaintiffs move for a preliminary injunction on the ground that the Presidential Memorandum violates the equal protection component of the Fifth Amendment because it is part of a sustained campaign that began with an unsuccessful attempt to add a citizenship question to the census and then continued by other means to dilute the voting power of non-white and Hispanic communities. Pls.' Mem. at 20–35.  In support, they point to the recently disclosed study of Dr. Thomas Hofeller, who worked closely on census issues with a trusted advisor to the Secretary.  The Hofeller study concludes that removing undocumented immigrants from the redistricting process would advantage "Republicans and Non-Hispanic Whites."  *Kravitz v. U.S. Dep't of Commerce*, 382 F. Supp. 3d 393, 398–400 (D. Md. 2019) (citation omitted).  Because we grant summary judgment on other grounds, we need not consider the plaintiffs' alternative request for a preliminary injunction.  Declining to reach the argument, however, in no way casts doubt on its validity.

certain" to lose a congressional seat if the Presidential Memorandum's policy is implemented. *Id.* at 9–10.[3]

## II.

We begin with the government's contention that plaintiffs lack standing and, relatedly, that their claims are not ripe for adjudication. The government asserts that it is not yet clear how the Memorandum will be implemented or even whether it will be implemented at all. This is because, according to the government, "[t]he extent to which it will be feasible for the Census Bureau to provide the Secretary of Commerce a second tabulation" wholly excluding undocumented immigrants from the apportionment base "is, at this point, unknown." Defs.' Opp'n at 7. Thus, says the government, any apportionment injury is too speculative to constitute the requisite "injury in fact" for standing purposes. And because "[a]nalyzing ripeness is similar to determining whether a party has standing," *Miller v. Brown*, 462 F.3d 312, 318–19 (4th Cir. 2006), the government argues that the plaintiffs' claims are not ripe for the same reasons.

We disagree. There may have been a time when the government plausibly could argue that it was "not known" whether any apportionment harm would befall the plaintiffs,

---

[3] Alternatively, plaintiffs contend that they have standing because the Presidential Memorandum substantially risks voter dilution and loss of federal funds and impairs the activities of the organizational plaintiffs by deterring census participation. *See* Pls.' Reply at 11–16. The plaintiffs in *New York v. Trump*, No. 20-CV-5770, 2020 WL 5422959, at *15–23 (S.D.N.Y. Sept. 10, 2020), successfully advanced this argument while the census count still was ongoing. But the Census Bureau's counting operations ceased on the day after oral argument in this case, *see* ECF No. 44, raising questions as to the continued validity of this theory. We do not and need not rely on it here, given that the plaintiffs before us have standing based on their impending apportionment harms.

because "the Secretary ha[d] not yet determined how he w[ould] calculate the number of illegal aliens in each State or *even whether it [wa]s feasible to do so at all*."  *New York*, 2020 WL 5422959, at *15 (emphasis added); *see also* ECF No. 36-2 ("Abowd Decl.") ¶ 15 (declaring, on September 1, 2020, that "the Census Bureau is in the process of determining the appropriate methodologies" to comply with the Presidential Memorandum).  But the record now before us documents the Census Bureau's concrete plans to implement fully the Memorandum, and so the plaintiffs have shown the requisite "substantial risk," *see Susan B. Anthony List v. Dreihaus*, 573 U.S. 149, 158 (2014) (citation omitted), that they will suffer the very apportionment harms the Memorandum is intended to inflict.[4]

We begin with the basics.  So long as at least one plaintiff in front of us has standing, then a justiciable controversy exists.  *Dep't of Commerce v. New York* ("*Commerce v. New York*"), 139 S. Ct. 2551, 2565 (2019).  Plaintiffs have standing if they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  The government challenges only the first prong, injury in fact.

---

[4] In this respect, we do not confront the same record that was before the court in *New York,* which suggested, without deciding, that an apportionment injury like the one alleged here was too speculative, in early September of 2020, to confer Article III standing.  *See* 2020 WL 5422959, at *15.  That same court indeed recognized that as the Census Bureau and Department of Commerce continued census data collection and processing, the alleged apportionment injuries might "no longer be [too] speculative" to support Article III jurisdiction.  *See* Opinion and Order Denying Stay, *New York*, No. 20-CV-2770, at 11 n.8 (S.D.N.Y. Sept. 29, 2020).  In our considered judgment, that time has come.

An injury in fact is sufficient to confer Article III standing when a plaintiff "has sustained or is immediately in danger of sustaining a direct injury." *Id.* at 1552 (Thomas, J., concurring) (citation omitted). There is no dispute that a future injury, like the plaintiffs' alleged apportionment harms, may suffice. As the parties agree, so long as an alleged future injury is "'certainly impending' or there is a 'substantial risk' that the harm will occur," then Article III standing is satisfied. *See Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)); *see also* Defs.' Opp'n at 10; Pls.' Reply at 5.[5] Likewise, no genuine dispute exists that the "expected loss of a Representative" through reapportionment "satisfies the injury-in-fact requirement of Article III standing." *Dep't of Commerce v. U.S. House of Representatives* ("*Commerce v. House*"), 525 U.S. 316, 331 (1999). When a state "anticipate[s] losing a seat in Congress," that "diminishment of political representation" is a concrete injury suffered by both the state itself, *see Commerce v. New York*, 139 S. Ct. at 2565, and its citizens, *see Commerce v. House*, 525 U.S. at 331–32.

---

[5] *Clapper v. Amnesty International USA*, 568 U.S. 398, 414 n.5 (2013), suggests in a footnote that, at least in some cases, it may be appropriate to focus exclusively on the "certainly impending" formulation. Since *Clapper*, however, the Supreme Court has continued to apply the disjunctive standard embraced by both parties here, asking whether there is *either* a "substantial risk" of injury *or* a "certainly impending" injury. *See Commerce v. New York*, 139 S. Ct. at 2565; *Susan B. Anthony List*, 573 U.S. at 158. And this case involves none of the "foreign affairs" concerns that counseled in favor of emphasizing the "certainly impending" standard in *Clapper*. *See* 568 U.S. at 409. Equally important, as in *Clapper*, *id.* at 414 n.5, the precise terminology makes no difference. However the inquiry is framed, the plaintiffs' alleged apportionment harms are not so "conjectural or hypothetical" that they fail to confer Article III standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation and internal quotation marks omitted).

Squarely before us is whether implementing the Presidential Memorandum creates a "substantial risk" that states in which at least some of the individual plaintiffs reside will lose congressional seats if undocumented immigrants are excluded from the apportionment base. Reviewing the record in the light most favorable to the government, *see Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646, 650 (4th Cir. 2017), the plaintiffs have met their burden of establishing that substantial risk. *See Commerce v. House*, 525 U.S. at 330; *City of San Jose*, 2020 WL 6253433, at *22.

The government does not materially contest that once implemented, the Memorandum's policy of excluding undocumented immigrants from the apportionment base to the "maximum extent feasible," *see* Presidential Memorandum, 85 Fed. Reg. at 44,680, almost certainly will cause both California and Texas – states in which multiple plaintiffs reside – to lose congressional seats in the upcoming apportionment. *See* ECF No. 19-7 ("Gilgenbach Decl.") at 12–13 ¶¶ 22–23; *see also* ECF No. 19-3 ("Kang Decl."), at 1 ¶¶ 3–4; ECF No. 19-3 ("Dodani Decl."), at 4 ¶¶ 3–4; ECF No. 19-3 ("Lira Decl."), at 7 ¶¶ 3–6; ECF No. 19-3 ("Ulloa Decl."), at 9 ¶¶ 3–4. This is true no matter the precise methodology used by the Secretary or the exact number he provides the President. Even under a wide range of assumptions and accounting for statistical uncertainty, California and Texas are "highly likely to lose a congressional seat if undocumented immigrants [are] removed from congressional apportionment calculations." Gilgenbach Decl. ¶ 23; *see also id.* ¶¶ 9–39. And of course, that is to be expected. The Presidential Memorandum announced expressly that its goal is to reduce representation in states with significant numbers of undocumented immigrants. *See* Presidential Memorandum, 85 Fed. Reg. at

44,680 (explaining that states with large numbers of undocumented immigrants should not be "rewarded with greater representation in the House of Representatives"). Indeed, as the government clarified at oral argument, the unnamed state singled out by the Memorandum that is likely to lose two or three congressional seats as a result of the Memorandum is California, ECF No. 47 ("Oral Arg. Tr."), at 24, in which several plaintiffs live.

None of this is genuinely disputed. The government does *not* argue that there is no "substantial risk" that, if implemented, the Memorandum would produce the intended apportionment harms. Instead, the government stakes its argument on a different proposition: that there is no "substantial risk" that the Memorandum actually *will* be implemented, or at least fully *enough* implemented to bring about the desired shift of congressional seats. In support of this argument, the government highlights that the Memorandum calls for the exclusion of undocumented immigrants only to the extent "feasible" or "practicable," *see* 85 Fed. Reg. at 44,680, and perhaps it will not prove "feasible" to identify all or even any undocumented immigrants for subtraction from the apportionment base. Defs.' Opp'n at 8. Or maybe, the government suggests, it will be "practicable" to identify only some "hypothetical smaller" subset of undocumented immigrants whose exclusion might not suffice to cost California or Texas a congressional seat. *Id.* at 44. In short, the government argues, whether the Presidential Memorandum will be implemented as intended remains so "conjectural [and] hypothetical" that the plaintiffs cannot show a "substantial risk" of injury. *Id.* at 10 (citations omitted).

Like the court in *City of San Jose*, *see* 2020 WL 6253433, at *17–20, we disagree. On its face, the Memorandum makes "abundantly clear" its intent to exclude not some but

13

all undocumented immigrants from the apportionment base, and "unambiguously commands action" to achieve that goal. *Id.* at *18 (internal quotation marks omitted). The Memorandum plainly states that "it is the policy of the United States to exclude" undocumented immigrants from the apportionment base "to the maximum extent feasible." Presidential Memorandum, 85 Fed. Reg. at 44,680. And if there were any doubt that what is contemplated is to exclude *all* undocumented immigrants from the apportionment count, the Memorandum dispels it by explicitly referencing the "more than 2.2 million illegal aliens" living in California, *id.*, an estimate of the *total* number of undocumented immigrants in that state.[6] Given the Memorandum's plain text and stated purpose, the "presumption of regularity" that attaches to agency action means that we presume, in the absence of contrary evidence, that the Secretary and Census Bureau will take the steps necessary to exclude not some but all undocumented immigrants from the apportionment base. *See United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926); *see also U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001).

At oral argument in mid-October, the government took the position that notwithstanding the rapidly approaching end-of-year deadline for the Secretary's report, agency planning under the Memorandum remained so preliminary and "dynamic" that it was impossible to say what the Secretary might be able to produce. Oral Arg. Tr. 8–10.

---

[6] *Unauthorized immigrant population trends for states, birth countries and regions*, Pew Rsch. Ctr. (June 12, 2019), https://www.pewresearch.org/hispanic/interactives/unauthorized-trends/ (estimating 2.2 million undocumented immigrants resided in California in 2016).

But the supplemented record in this case, based on the government's own sworn declarations and filings in parallel litigation, is replete with evidence of concrete plans to provide the President with a number approximating the total number of undocumented immigrants in each state. Specifically, the Census Bureau will start by providing the Secretary, by December 31, 2020, with the number of all "unlawful aliens in ICE Detention Centers." Decl. of Albert E. Fontenot, Jr. ¶ 8, *La Unión Del Pueblo Entero v. Trump*, No. 8:19-cv-2710 (D. Md. Oct. 2, 2020), ECF No. 126-1. Next, the Bureau, by January 11, 2021, will "provide the Secretary with other Presidential Memorandum-related outputs." *Id.* Critically, these "outputs" will be submitted as "necessary to *fully implement* the Presidential Memorandum." *See* Decl. of Albert E. Fontenot, Jr. ¶ 26, *Nat'l Urb. League v. Ross*, No. 5:20-cv-05799 (N.D. Cal. Oct. 1, 2020), ECF No. 284-1 (emphasis added).

This is not some inchoate plan, so vague that it presents no "substantial risk" of coming to fruition. As discussed, the Bureau has provided exact dates for the provision of information. *See* Fontenot Decl. ¶ 8, *La Unión Del Pueblo Entero*, No. 8:19-cv-2710, ECF No. 126-1. And the Bureau is certain enough of exactly what will be entailed in the collection of that information that it can quantify – to the day – how long such collection will take. Postponing the provision of additional "Memorandum-related outputs" until January of 2021, the Census Bureau has attested, will save it precisely five days of work in December, which it now can devote to "post-data collection processing" for the 2020 Census. *Id.* ¶ 4. The meticulousness of the agency's calculations belies any suggestion that the Bureau has yet to determine whether and how it will transmit to the Secretary the

15

data necessary to "fully implement" the Presidential Memorandum.  Fontenot Decl. ¶ 26, *Nat'l Urb. League*, No. 5:20-cv-05799, ECF No. 284-1.

The government has offered no counterweight to this evidence.  It has provided no reason why it would *not* be feasible for the Bureau and the Secretary to tabulate the total number of undocumented immigrants in each state.  *See City of San Jose*, 2020 WL 6253433, at *19–20.  Nor is one readily apparent.  As of July 2019, the Census Bureau possessed records that would allow it to identify the citizenship status of 90 percent of the United States population.  *See* Exec. Order No. 13,880, 84 Fed. Reg. 33,821, 33,821 (July 16, 2019).  The President also issued an Executive Order on "Collecting Information About Citizenship Status in Connection with the Decennial Census," in which he instructed agencies to share with the Department of Commerce – in time for use in conjunction with the 2020 Census – any additional records that would identify citizenship status so as to "generate a more reliable count of the unauthorized alien population in the country."  *Id.* at 33,823; *see also id.* at 33,824.  And since then, the Bureau has made significant progress toward implementing the Presidential Memorandum, obtaining additional administrative records that will allow it, in the government's words, to "ascertain the illegal alien population."  *See City of San Jose*, 2020 WL 6253433, at *19–20 (quoting defendants' statement at court hearing).

Simply stated, the plaintiffs have shown the requisite "substantial risk" that the Presidential Memorandum will be implemented as intended, causing the intended apportionment harms.  If any evidence exists that the Census Bureau or Secretary will not or cannot comply fully with the Memorandum, the government has yet to share such

evidence with us.  *See id.* at \*20 n.11.  Any speculative and theoretical possibility that the agency may fall short in its efforts to carry out the Memorandum's announced policy does not negate the plaintiffs' showing of "substantial risk" sufficient to confer standing.  *See id.* at \*17–20.

We next turn to ripeness.  Because both standing and ripeness flow from Article III's case or controversy requirement, *see South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019), "[a]nalyzing ripeness is similar to determining whether a party has standing" in that it "prevents judicial consideration of issues until a controversy is presented in 'clean-cut and concrete form,'" *Miller*, 462 F.3d at 318–19 (quoting *Rescue Army v. Mun. Ct. of L.A.*, 331 U.S. 549, 584 (1947)).  The "basic rationale" of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).  For reasons similar to those previously discussed, the plaintiffs face a substantial risk of a direct and imminent apportionment injury, and thus their claims are ripe for adjudication.

In urging us to find the claims unfit for adjudication, the government puts forward the same who-knows-what-will-happen argument, and we likewise reject it here.  The Bureau and Secretary soon will "fully implement" the Presidential Memorandum, *see* Fontenot Decl. ¶ 26, *Nat'l Urb. League*, No. 5:20-cv-05799, ECF No. 284-1, causing the plaintiffs an actual and imminent apportionment harm.  The only question presented is whether the government has the lawful authority to do what it has repeatedly reaffirmed it

17

will: exclude the maximum possible number of undocumented immigrants from the apportionment base.  That question is "purely legal," *Miller*, 462 F.3d at 319, and involves no aspect that would "benefit from further factual development."  *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).  Of course it is true, as the government points out, that "[w]here an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe."  *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013).  But the government is not a third-party actor.  And it plainly has acted here, taking numerous concrete steps to fully implement the Memorandum's policy of maximum exclusion.

The government nonetheless urges us to defer review to avoid "improperly interfer[ing] with the Census Bureau's ongoing efforts to determine how to respond to the Presidential Memorandum" and "imped[ing] the apportionment."  Defs.' Opp'n at 8.  But it has put forward no reasonable argument that hearing this case now will disturb the 2020 Census.  In fact, the government has stressed repeatedly that the Presidential Memorandum is concerned with apportionment only and has no impact on the census or census procedures.  *See id.* at 11; ECF No. 36-1 ("Fontenot Decl.") ¶ 13.

Nor will judicial review interfere with ongoing agency action.  The Census Bureau can go forward with its count of undocumented immigrants while we resolve the "clean-cut and concrete" questions presented, *Miller*, 462 F.3d at 319 (citation omitted), and, if warranted, enjoin the Secretary from providing the President with the results.  *Cf. New York*, 2020 WL 5422959, at *35 (allowing agency to "continu[e] to study whether and how it would be feasible to calculate the number of illegal aliens in each State" while enjoining

transmittal of data to the President).  And the government's argument that judicial review will impede the apportionment process only stands if it succeeds on the merits:  If the government cannot exclude undocumented immigrants from the apportionment base as a matter of law, then judicial review only "imped[es]" the government from violating federal law or the Constitution.  *See City of San Jose*, 2020 WL 6253433, at *23.  The plaintiffs' claims are thus "fit for judicial review" and ripe under Article III.  *South Carolina*, 912 F.3d at 730.

The government, however, has a fallback argument.  Even if we *could* hear this case now, it suggests that we wait because "census and apportionment cases generally are decided post-apportionment," and following that practice here would cause the plaintiffs no harm.  Defs.' Opp'n at 9.  But we need not consider whether waiting visits appreciably more or less harm to the plaintiffs.  Their claims are plainly fit for review now, with no risk that adjudication will interfere with agency efforts and no need for further factual development, and so there is nothing against which to balance any costs of delay.  *See South Carolina*, 912 F.3d at 730; *City of San Jose*, 2020 WL 6253433, at *24; *see also Miller*, 462 F.3d at 319 (courts should balance the fitness of issues for decision against the hardship to parties in waiting when they are in conflict).  And while it may be *possible* to remedy an apportionment harm after the fact, *see Utah v. Evans*, 536 U.S. 452, 459 (2002), it is not required, *see Commerce v. House*, 525 U.S. at 328–34 (considering pre-apportionment challenge), and it is hard to see why it would be desirable here.

This is *not* a situation where plaintiffs chose to raise claims post-apportionment, once the nature of the claims and consequent injuries became clear.  *See City of San Jose*,

2020 WL 6253433, at *22 & n.13 (discussing cases); *cf. Utah*, 536 U.S. at 458.  We know now, before actual apportionment, who would be injured were the Presidential Memorandum implemented – California and Texas, at a minimum, along with their residents, *see* Gilgenbach Decl. ¶ 23 – so there is no need to wait.  And as the government itself has stressed in parallel litigation, "a post-apportionment remedy, while available, would undermine the point of the deadlines established by Congress, which is to provide prompt notice to the Nation about the new apportionment that will govern the next congressional elections."   Motion for Expedited Consideration of the Jurisdictional Statement at 6, *Trump v. New York*, No. 20-366 (U.S. Sept. 22, 2020); *see also* Defs.' Opp'n at 9 (asserting tabulations "called for by the Memorandum must be reported by no later than the end of this year").  A post-apportionment remedy also runs the risk of frustrating the efforts of states to complete their own redistricting on schedule.  *See Commerce v. House*, 525 U.S. at 333–34; *City of San Jose*, 2020 WL 6253433, at *24.  And it needlessly would introduce certain complexities regarding the fashioning of relief:  Once the Secretary delivers his tabulation of undocumented immigrants to the President, the most obvious remedy would be an injunction not against the Secretary – whose primary role in apportionment would have ended – but against the President, an "extraordinary" form of relief, *see Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992), that courts normally should avoid where possible.  *See New York*, 2020 WL 5422959, at *34 (citing *Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973) (en banc)).

In light of these considerations, we cannot agree with the government that the circumstances here counsel against the exercise of jurisdiction.  No good reason exists to

postpone consideration of the legal questions presented by the Presidential Memorandum, where waiting to grant relief would mean undoing an apportionment already completed. A "federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging," *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citation and internal quotation marks omitted), and so we turn next to the merits of the plaintiffs' partial summary judgment motion.

## III.

Two three-judge panels already have thoroughly canvassed the merits of the plaintiffs' claims. Both held that the Presidential Memorandum is unlawful. *See City of San Jose*, 2020 WL 6253433, at *25–26; *New York*, 2020 WL 5422959, at *2, *25–32. We agree with both decisions and incorporate their detailed reasoning to the extent the issues are presented identically here.

Like both *City of San Jose* and *New York*, we conclude that the Presidential Memorandum deviates from the governing federal statutes both by excluding undocumented immigrants from the apportionment base solely because of their legal status and by directing the use of non-census data for apportionment. Because of these clear statutory violations, we, like the *New York* court, decline to reach the plaintiffs' constitutional claims. *See New York*, 2020 WL 5422959, at *25 (citing *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)). We of course agree with *City of San Jose* that the relevant constitutional provisions and history inform the meaning of the statutes, *see* 2020 WL 6253433, at *25, and our decision to rest on statutory grounds alone in no way calls into question that court's constitutional holding.

21

**A.**

We start with the straightforward statutory scheme governing who must be included in the apportionment base.  Section 141(b) requires that the Secretary report to the President "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives in Congress."  13 U.S.C. § 141(b).  Section 2a then mandates that the President use that tabulation for apportionment:  The President must transmit to Congress "the whole number of persons in each State . . . as ascertained under the . . . decennial census" and use that number to apportion congressional seats.  2 U.S.C. § 2a(a).

The government, appropriately, does not dispute that undocumented immigrants are "persons" under the meaning of Section 2a.  *Cf. Plyler v. Doe*, 457 U.S. 202, 210 (1982) (holding that "persons" under the Fourteenth Amendment includes all persons regardless of their "status under the immigration laws").  Nor does it spend much time focusing on the modifier "in," Defs.' Opp'n at 22, 37–38:  Based on the ordinary meaning of "in," as well as accepted canons of statutory interpretation, the phrase "persons in each state" cannot reasonably be read to exclude "undocumented immigrants living in each state."  *See City of San Jose*, 2020 WL 6253433, at *43.

Instead, the government pins its hope for success on the Supreme Court's use and treatment of the term "inhabitant" in connection with the census and apportionment.  *See Franklin*, 505 U.S. at 803–05 (noting that, since the first census in 1790, Congress and the Census Bureau counted persons as "in" each state if the state was their "usual residence" or if they were an "inhabitant" of the state (citations omitted)); *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964) (apportionment is determined by "the number of the State's inhabitants").

From this, the government derives the principle that "the whole number of persons in each State," 2 U.S.C. § 2a(a), means the whole number of inhabitants of each state, and that Congress has vested the Executive with significant discretion to decide who qualifies as an "inhabitant" of a state.  *See* Defs.' Opp'n at 22–23, 37–40.

Like *New York* and *City of San Jose*, we disagree with the government's contentions. We may assume that the government's premise is correct, and "persons in each state" means only "inhabitants," or perhaps "usual residents."   But that makes no difference because undocumented immigrants are "inhabitants" of the states where they live as surely as they are "persons in" those states.

The ordinary meaning of an inhabitant is "one that occupies a particular place regularly, routinely, or for a period of time."  *Inhabitant*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/inhabitant.    "[H]owever ambiguous the term may be on the margins, it surely encompasses illegal aliens who live in the United States – as millions of illegal aliens indisputably do, some for many years or even decades." *New York*, 2020 WL 5422959, at *29.   Indeed, a "clear majority of undocumented immigrants have lived in the United States for over five years and have families, hold jobs, own houses, and are part of their community."  ECF No. 19-6 ("Barreto Decl.") ¶ 17.  Put simply, a person's immigration status is irrelevant to the state which she regularly occupies or to her "usual residence."  *See City of San Jose*, 2020 WL 6253433, at *43–45; *New York*, 2020 WL 5422959, at *29.[7]

_____

[7] In the alternative, the government argues that *some* undocumented immigrants – for instance, those in immigration detention – would not fall within the normal definition

The historical context in which Section 2a was passed and subsequent historical practice confirm this common-sense conclusion.  In 1929, when Congress first provided that the apportionment base is the total of the "whole number of persons in each State," *see* Act of June 18, 1929, Pub. L. No. 71-13 § 22, 46 Stat. 21, 26, the Senate and House voted down amendments that would have excluded non-citizens.  *See New York*, 2020 WL 5422959, at *30–31 & n.17.  The Senate even put aside the argument, as true but irrelevant, that the bill would include in the apportionment base several million non-citizens who had entered unlawfully "without the consent of the American people."  71 Cong. Rec. 1919 (1929) (statement of Sen. Heflin).  And since that bill became law, no branch of the federal government *ever* has taken the position – prior to the Presidential Memorandum – that the Executive's discretion to define "the whole number of persons in each State" includes the discretion to exclude undocumented immigrants.  *See New York*, 2020 WL 5422959, at *32.  Quite the opposite, Congress repeatedly has rejected bills to exclude non-citizens from the apportionment base.  *See* H.R. Rep. No. 76-1787, at 1 (1940); *1980 Census: Counting Illegal Aliens: Hearing Before the S. Subcomm. on Energy, Nuclear Proliferation & Fed. Servs. of the Comm. on Governmental Affs.*, 96th Cong. 10 (1980).  And the

---

of "inhabitant" and could be excluded from the apportionment.  But if this were so, it would be because of a construction of the Residence Rule, and not the immigrants' legal status as undocumented persons.  In any event, we are not called upon to decide whether a narrow subset of undocumented immigrants may be excluded from the apportionment base.  As we have explained, the Presidential Memorandum's plain terms and evident purpose contemplate *wholesale* exclusion of undocumented immigrants, not some targeted refinement of the Census Bureau's Residence Rule.  *See New York*, 2020 WL 5422959, at *29 n.16.

Executive Branch always has taken the view, until now, that the 1929 Act, if not the Constitution, *prohibits* excluding undocumented immigrants from the apportionment based on legal status alone. *New York*, 2020 WL 5422959, at \*31–32.[8]

Against this unbroken history, the government points us to past occasions – recited by the Presidential Memorandum – in which "aliens who are only temporarily in the United States" and "certain foreign diplomatic personnel" have been excluded from the apportionment base. Presidential Memorandum, 85 Fed. Reg. at 44,679. But under the Census Bureau's Residence Rule and irrespective of the Presidential Memorandum, persons visiting the United States or certain diplomatic personnel would be excluded from the apportionment base because they are not *usual* residents of any state. The opposite is true for many undocumented immigrants living in the United States who indisputably are usual residents with deep ties to their states. *See City of San Jose*, 2020 WL 6253433, at \*29. Nor, contrary to the government's position, is this common-sense conclusion disturbed by the fact that undocumented immigrants "have not legally entered and as a

_____

[8] Because it is clear that "persons in each State" included undocumented immigrants when Section 2a's predecessor was enacted in 1929, we need not look to the meaning of the term at the Founding nor at the time of the Fourteenth Amendment. *See New York*, 2020 WL 5422959, at \*30 n.17 ("For this reason, we need not and do not delve into the meaning of the terms 'inhabitant' and 'usual residence' at the time of the Founding or of the Reconstruction Amendments, or consider whether the concept of unlawful status was known to the Framers of Article I or the Fourteenth Amendment. There is no dispute that the concept of 'illegal aliens' existed in 1929, when Section 2a was enacted."). In any event, the government's citation to Chief Justice Marshall's partial concurrence and partial dissent in *The Venus*, 12 U.S. (8 Cranch) 253, 289 (1814), dealing with war prizes – which itself cites the theorist Emmerich de Vattel's 1760 definition of "inhabitants" as "strangers who are permitted to settle and stay in the country" – does nothing to disturb the long-understood meaning that an inhabitant for purposes of the census is defined by his or her usual residence, not immigration status. *See* Defs.' Opp'n at 29, 35.

matter of law may be removed from the country at any time." Defs.' Opp'n at 36. To state the obvious, a person "living in a State but facing future removal is no less a 'person[] in that State' than someone living in the State without the prospect of removal." *New York*, 2020 WL 5422959, at *30 (alteration in original) (citation omitted); *see also City of San Jose*, 2020 WL 6253433, at *45.

For that reason, the government's heavy reliance on *Kaplan v. Tod*, 267 U.S. 228 (1925) is misplaced. There, a non-citizen minor had been denied access to the United States in 1914 but was paroled in the country to wait out the First World War. *See id.* at 230. The Court held the minor had not "bec[o]me a citizen" during that time because she was not "dwelling within the United States." *Id.* To be sure, as *Kaplan* suggests, immigration status is relevant to *citizenship* status. But *Kaplan* says nothing about whether a person is an "inhabitant" for purposes of the census when residing on American soil. If anything, *Kaplan* cuts against the government – the minor in *Kaplan* actually was *included* in the 1920 census while paroled. *See* Decl. of Jennifer Mendelsohn ¶ 3, *New York*, No. 20-CV-5770 (S.D.N.Y. Aug. 25, 2020), ECF No. 149-2.

"With neither text nor history on [its] side," *New York*, 2020 WL 5422959, at *32, the government is left to argue that excluding undocumented immigrants from apportionment is "more consonant with the principles of representative democracy underpinning our system of Government." Presidential Memorandum, 85 Fed. Reg. at 44,680. That is contested, at a minimum; as the Supreme Court has explained, the congressional seats apportioned under 2 U.S.C. § 2a(a) "serve all residents, not just those eligible or registered to vote." *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1132 (2016). But

whatever the merits of the Memorandum's theory of representative democracy, Congress adopted a different one when it directed that apportionment be based on the "whole number of persons in each State."  2 U.S.C. § 2a(a).  Because the Memorandum deviates from that command, it is unlawful.

## B.

Like the *City of San Jose* and *New York* courts, we also conclude that the Presidential Memorandum violates a second statutory requirement: that the congressional apportionment be based on the results of the census and *only* the results of the census.  *See City of San Jose*, 2020 WL 6253433, at *45–46; *New York*, 2020 WL 5422959, at *25–29.

The statutory command is clear.  Section 141(b) requires the Secretary to report to the President one set of numbers: "[t]he tabulation of total population by States under subsection (a) of this section" – that is, as counted under the decennial census – "as required for the apportionment of Representatives in Congress."  13 U.S.C. § 141(b); *see also id.* § 141(a) (providing for the taking of the decennial census).  Section 2a also requires the President to "transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, *as ascertained under the . . . decennial census* of the population, and the number of Representatives to which each State would be entitled."  2 U.S.C. § 2a(a) (emphasis added).  In short, and as neither party disputes, Section 2a "expressly require[s] the President to use . . . the data from the 'decennial census'" for apportionment.  *See Franklin*, 505 U.S. at 797.

As the court in *New York* explained at length, this is not some empty formality.  Congress intended to create a "virtually self-executing" apportionment scheme, *see id* at

792, under which the President would be left without "discretionary power" to choose his own numbers for purposes of apportionment, and would instead be required to use the numbers collected and reported by the census. *See New York*, 2020 WL 5422959, at *26 (internal quotation marks omitted); *see also Franklin*, 505 U.S. at 799 (once the President is provided with the final decennial census data, the apportionment calculation is "admittedly ministerial"). And until now, the Department of Justice has acknowledged as much, consistently taking the position that the "President's statement to Congress regarding apportionment has to be based solely on the tabulation of total population produced by the census." *See New York*, 2020 WL 5422959, at *26.

The Presidential Memorandum flouts this statutory requirement. Under the Memorandum, the Secretary is directed to give the President one set of numbers derived from the census and tabulated according to the Census Bureau's Residence Rule, which does not take account of citizenship status. *See* Presidential Memorandum, 85 Fed. Reg. at 44,680. But now the Secretary must also provide a "second" number as well: "the population of each State 'exclud[ing]' illegal aliens." *See New York*, 2020 WL 5422959, at *27 (alteration in original) (citation omitted). And wherever that second number comes from – a matter over which the Secretary is given discretion – it will not be a product of the census. The Memorandum in this respect is clear. It contemplates two *separate* tabulations, one derived from the census and one not. *Id.*; *see* Presidential Memorandum, 85 Fed. Reg. at 44,680; Defs.' Opp'n at 4 (describing "two tabulations" to be provided by the Secretary). Because the Memorandum would have the President base apportionment

28

on the second number, in order to exclude undocumented immigrants counted by the first, *see* Presidential Memorandum, 85 Fed. Reg. at 44,680, it is unlawful.

The government does not dispute that the President must base the apportionment on numbers derived from the decennial census.  Instead, it argues that the President has the "authority to direct the Secretary in making policy judgments that result in 'the decennial census,'" which allowed the President in *Franklin* to order the counting of overseas federal employees as part of the census.  *See Franklin*, 505 U.S. at 799–800, 806.  It follows, the government contends, that the President here can choose to adopt the second set of numbers provided by the Secretary – a tabulation from which undocumented immigrants have been subtracted – as the "decennial census" upon which he will rely for apportionment.

We disagree.  This case is not about the extent of the President's discretion to order the exclusion of a class of people from the census, because that is not what the Presidential Memorandum does.  *See* Opinion and Order Denying Stay at 6–7, *New York*, No. 20-CV-2770.  The Memorandum does *not* direct that undocumented immigrants be subtracted from the census count.  Instead, the Memorandum carefully specifies that undocumented immigrants are to be excluded from the "apportionment base," as *distinct* from the census itself.  *See*, *e.g.*, Presidential Memorandum, 85 Fed. Reg. at 44,679 ("Excluding Illegal Aliens from the Apportionment Base *Following the 2020 Census*" (emphasis added)); *id.* ("Although the Constitution requires the 'persons of each State, excluding Indians not taxed,' to be *enumerated in the census*, that requirement has never been understood to *include in the apportionment base* every individual physically present within a State's boundaries . . . ." (emphases added)).  The government's consistent litigating position

echoes this directive, emphasizing that the "Presidential Memorandum does not purport to change the conduct of the census itself." *See* Defs.' Opp'n at 11; Fontenot Decl. ¶ 13 ("The Presidential Memorandum . . . has had no impact on the design of field operations for [the] decennial census, or on the Census Bureau's commitment to count each person in their usual place of residence, as defined in the Residence Criteria.").

The Presidential Memorandum in this regard does not implicate the President's authority to oversee the conduct of the census, as articulated in *Franklin*.  Rather, the Memorandum separates the final census tabulation – to be delivered to the President unaffected by anything in the Memorandum – from the second set of non-census numbers also to be delivered and on which the President will base the apportionment.  Nothing in *Franklin* "suggest[s], let alone hold[s], that the President has authority to use something other than the census when calculating the reapportionment."  *New York*, 2020 WL 5422959, at *28.  Nor does *Franklin* permit the Secretary to transmit a number other than the total population as derived by the census in his Section 141(b) report.  But that is precisely what the Presidential Memorandum directs, and for that reason, it violates Section 141(b) and Section 2a.[9]

---

[9] It is true but beside the point that the Census Bureau may use administrative records and data as part of the actual enumeration.  *See* Defs.' Opp'n at 39–40; *see also Utah*, 536 U.S. at 457; *Franklin*, 505 U.S. at 794–96, 803–06.  We do not conclude that the Presidential Memorandum is *ultra vires* because it requires the use of administrative records.  It is *ultra vires* because it requires the administrative records be used to calculate a number other than the actual census enumeration upon which apportionment will be based.

## IV.

For the foregoing reasons, we grant summary judgment to the plaintiffs on the statutory claims under 2 U.S.C. § 2a and 13 U.S.C. § 141.  We must therefore assess whether the plaintiffs are entitled to the permanent injunction and declaratory relief they seek.

To warrant a permanent injunction, the plaintiffs must show (1) that they otherwise will suffer an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for their injury; (3) that, considering the balance of hardships between them and the government, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 385–86 (4th Cir. 2017).  Where, as here, "the Government is the opposing party," the balance of the hardships and public interest merge together.  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Roe v. Dep't of Def.*, 947 F.3d 207, 230 (4th Cir. 2020).

The plaintiffs easily meet this standard.  Their apportionment harm would "irreparably dilute[] voting power and the allocation of political representation"  in a way that cannot be remedied by monetary damages.  *City of San Jose*, 2020 WL 6253433, at *50.  And the plaintiffs would suffer those irreparable injuries in, at the very least, every congressional and presidential election until the next reapportionment following the next decennial census.  *See New York*, 2020 WL 5422959, at *33.

31

The balance of hardships and the public interest also favor granting a permanent injunction.  The public interest is served by a valid reapportionment and is harmed when the government acts contrary to federal law.  *See id.*  In comparison, the government's only alleged hardship – that "an injunction would impede the Executive's historic discretion in conducting both the census and the apportionment," Defs.' Opp'n at 49 – is illusory.  The government has repeatedly stated that the Presidential Memorandum has not and will not impact the conduct of the census, and any impediment to the apportionment would do no more than ensure that the government acts lawfully.  *Id.* at 11.

We therefore enjoin all of the defendants except the President from including in the Secretary's Section 141(b) report any "information permitting the President . . . to exercise [his] discretion to carry out the policy set forth in section 2" of the Presidential Memorandum – that is, any information concerning the number of non-citizens in each state "who are not in a lawful immigration status under the Immigration and Nationality Act."  Presidential Memorandum, 85 Fed. Reg. at 44,680.  The Secretary must include only one number in his Section 141(b) report: "[t]he tabulation of total population by States" as derived by the decennial census, which includes undocumented immigrants who are inhabitants of the United States.  *See* 13 U.S.C. § 141(b).  And in light of the Census Bureau's stated plan to send "other Presidential Memorandum-related outputs" to the President after the statutory deadline for the Section 141(b) report, *see* Fontenot Decl. ¶ 8, *La Unión Del Pueblo Entero*, No. 8:19-cv-2710, ECF No. 126-1, the government also is enjoined from transmitting to the President any data or information on the number of undocumented immigrants in each state intended for use in apportionment.  The

government may, however, continue to collect data regarding the number of undocumented immigrants in each state if it so chooses.

Finally, and for similar reasons, we grant the plaintiffs' request for declaratory relief.  Granting declaratory relief often "serve[s] a useful purpose in clarifying and settling the legal relations in issue."  *Centennial Life Ins. Co. v. Poston*, 88 F.3d 255, 256 (4th Cir. 1996) (citation omitted).  This is particularly important here because we decline to grant injunctive relief against the President, even though he is the central actor in reapportionment.  And granting declaratory relief firmly settles the legal questions at issue for the governmental actors who may continue to collect data relevant to counting the number of undocumented immigrants in each state.  Accordingly, we declare that the Presidential Memorandum is *ultra vires,* in violation of 2 U.S.C. § 2a and 13 U.S.C. § 141, to the extent it directs or permits the exclusion of undocumented immigrants from the total population to be used for reapportionment and because it directs the Secretary to include in his Section 141(b) report, and the President to base reapportionment on, data collected outside the decennial census.

## V.

For the reasons given above, we grant the plaintiffs' motion for partial summary judgment.  We need not and do not reach the merits of plaintiffs' other claims.[10]

---

[10] We believe that this matter was properly heard by a three-judge panel for the reasons set forth in Judge Xinis's request to Chief Judge Gregory for the appointment of such a panel.  ECF No. 21.  Nevertheless, we follow the lead of prior three-judge panels by certifying that Judge Xinis, to whom this case was originally assigned, individually arrived at the same conclusions that we have reached collectively.  *See, e.g.*, *New York*, 2020 WL 5422959, at *36 n.21.

\_\_\_\_11/06/2020_____    _____/S/_____
Date                                    Pamela A. Harris
                                        United States Circuit Judge


                                        _____/S/_____
                                        Ellen L. Hollander
                                        United States District Judge


                                        _____/S/_____
                                        Paula Xinis
                                        United States District Judge